**TELEDYNE INDUSTRIES, INC.,**
**Plaintiff,**

v.

**EON CORPORATION et al.,**
**Defendants.**

No. 72 Civ. 3261.

United States District Court,
S. D. New York.

March 20, 1974.

192

Breed, Abbott & Morgan, New York City (Stephen R. Lang, Charles M. Mitchell, New York City, of counsel), for plaintiff.

Feldshuh & Frank, New York City (Sidney Feldshuh, Richard Weinberger, New York City, of counsel), for defendants Srybnik, Podell, Anton and Waller.

OPINION

BAUMAN, District Judge.

This is a diversity action brought by Teledyne Industries, Inc., a California corporation with its principal place of business in Los Angeles against Eon Corporation, a New York corporation with its principal place of business in Brooklyn, and four of its officers and/or directors, Podell, Srybnik, Anton and Waller.[1] Before the court are two motions, one by the plaintiff and one by the four individual defendants.[2] Plaintiff moves pursuant to Rule 37(a)(2) of the Federal Rules of Civil Procedure for an order compelling production of certain documents previously requested under Rule 34. Defendants move, pursuant to Rule 56, for partial summary judgment dismissing plaintiff's action as against them. I shall first consider defendants' motion, for it requires an exposition of the underlying facts necessary for an understanding of the discovery motion as well.

I.

As an introduction to the discussion of the summary judgment motion, it will be useful to set forth those facts which are undisputed. What follows, then, is drawn from defendants' 9(g) statement, the pleadings, and the transcripts of the various depositions submitted by the parties.

The Eon Corporation, founded in 1961, is engaged in the development and manufacture of "medical, nuclear, electronic and optical devices."[3] In December, 1968 it acquired what became its American Marc Division, which was located in Inglewood, California and was engaged in the manufacture of diesel engines and electric generators. Of the individual defendants, Anton is president of Eon, Podell chairman of the board, Waller secretary, and Srybnik, both individually and through corporations he controls, the largest single shareholder. All are directors of Eon, and were at the time of the events in question.

On or about June 20, 1969, Eon, through American Marc, was awarded a contract by the United States Army, No. DAAK01–69–C–A359, for the manufacture, production and delivery of 1.5 KW generator sets. At some point in 1970, the Eon board decided to find a subcontractor to fulfill its remaining commitments thereunder. This decision had been reached pursuant to its earlier determination to terminate the operations of the unprofitable American Marc Division. Eon's interest in locating such a subcontractor had been communicated to one Eugene Wolper by M. J. Leonard, an Eon director and head of the American Marc Division. Wolper in turn contacted Harold Rouse, a Teledyne vice president, during the week of May 3, 1971. When Rouse expressed interest, a meeting was arranged in Los Angeles between Teledyne and Eon representatives for May 10, 1971.

The negotiations were completed in the brief span of three days, and culminated in the signing of contracts on May 12, 1971. Present during all or part of the negotiations were Leonard, Wolper, Rouse, and Homer Coleman, another Teledyne executive. Anton arived in

1. The action was dismissed against the sixth defendant, Kerns Manufacturing Corp., by a stipulation between the parties dated October 17, 1973.

2. The defendant Eon Corporation is currently undergoing an arrangement pursuant to Chapter XI of the Bankruptcy Act, (11 U.S.C. § 701 et seq.). On January 12, 1973, Bankruptcy Judge Manuel J. Price of the United States District Court for the Eastern District of New York signed an order staying all proceedings against Eon, 11 U.S.C. § 714, and it appears that Eon has not participated in the instant action since that date.

3. 1971 Annual Report of the Eon Corporation, p. 3.

Los Angeles on May 12, and participated in the final discussions and execution of the agreement.

Two documents were executed on that day. One was Purchase Order No. M-1257, wherein Teledyne agreed to manufacture 4,372 generator sets at a unit price of $360,[4] or a total cost of $1,573,920, and to deliver them as specified in the original Army contract. The other was an inventory agreement which provided, in essence, that Teledyne would purchase from Eon all of the generator set parts and material which Eon possessed in good condition on August 31, 1971, at a price equal to 75% of the inventory value of such equipment as well as the tooling, gauges, and other equipment necessary to perform the contract.

In addition, the parties also made certain arrangements for payment from Eon to Teledyne. A letter from Rouse to Leonard dated May 13, endorsed with Leonard's acceptance on May 25, set out the essential terms:

"Eon will arrange with Bank of America to hold funds received from 1.5 KW generator sales, covered on Eon Purchase Order No. M-1257 in a special account, which will be used to pay TCM [Teledyne] invoices. Mr. Leonard to confirm this, in writing, to exact arrangements, etc."

The arrangements were spelled out in a letter dated May 25, 1971, from Leonard to the Palos Verdes branch of the Bank of America.[5] The letter, which is set out in full in the margin,[6] provided for the deposit of all funds received by Eon from the sale of the generator sets to the government "in our special account which we have opened at the Bank of America for this purpose." Payments to Teledyne were to be made by cashier's check after Eon received the Teledyne invoices for generator sets produced and shipped, and after the government had paid Eon. The letter also provided that "[t]he balance in the account will be dispursed (sic) according to the direction of American Marc Division of Eon Corporation." The meaning of this phrase, as will be noted below, is very much in doubt.

Teledyne commenced production and delivery of the generator sets later in 1971, and for a time the arrangement worked as planned. However, in April or May of 1972, Eon informed Teledyne

---

4. The Army had agreed, under the original contract, to pay Eon a unit price of $392.

5. Plaintiff's copy of this letter, submitted to this court as deposition exhibit "D", bears a stamp indicating that Rouse received it on June 1, 1971.

6. "Bank of America
Golden Cove—Palos Verdes Branch
31176 Hawthorne Boulevard
Palos Verdes Peninsula, California 90274
Attention: Mrs. Fern Guy
Dear Mrs. Guy:
American Marc Division of EON Corporation has issued P.O. No. M-1257 to Teledyne Continental Motors, 1000 Ryan Avenue, Walterboro, South Carolina to produce approximately 4000 generator sets.
Accordingly we have agreed to have all funds received by American Marc from the sale of these generator sets to the U.S. Government held in our special account which we have opened at the Bank of America for this purpose.
Teledyne Continental Motors' invoices will be sent to American Marc for generator sets as they are produced and shipped by TCM. American Marc will immediately invoice the U.S. Government for the units shipped.
American Marc will notify the Bank of America and TCM the exact invoices and amounts that have been included in the American Marc request for payment from the U.S. Government.
When the funds are received, the check will be deposited in the special account and the Bank will be directed to use the funds to pay the amounts of the invoices, which were included in the payment check, directly to TCM by cashiers check. The balance in the account will be dispursed according to the direction of American Marc Division of EON Corporation.
We appreciate your courtesy extended to American Marc and TCM in this regard.
Sincerely,
AMERICAN MARC DIVISION
EON CORPORATION
/S/ M. J. Leonard
M. J. Leonard
Vice President-General Manager"

that it would no longer make payments under the subcontract. According to Anton, Eon's president, Eon was compelled to use the money received from the government for other corporate purposes. Had Eon paid Teledyne instead, he asserted, "the company would have stopped existing."[7] This lawsuit was commenced by Teledyne on July 27, 1972.

In its complaint, Teledyne sets forth two causes of action. In the first, it alleges that the defendants embarked upon a scheme to defraud Teledyne by inducing it to enter into a contract which they knew Eon lacked the means to perform. In pursuance of this scheme, it is charged that two fraudulent representations were made to Teledyne: (a) that the amount remaining to be paid Eon by the Army under the contract exceeded the subcontract price, and (b) that Eon had clear and unencumbered title to the inventory, tooling, and other equipment which Teledyne had agreed to purchase. The second cause of action alleges, in essence, a breach of fiduciary duty owed by Eon to Teledyne. It is claimed that Eon undertook to establish a special account for the payment of Teledyne's invoices, and further undertook not to withdraw any funds from this account until Teledyne had been paid in full. The funds received by Eon from the Army were "held in trust" in this account, it is alleged, and the subsequent diversion of such funds to other purposes constituted a breach of trust and an act of conversion.

## II.

In support of its motion for summary judgment with regard to the first cause of action, defendants argue that the facts as developed in the numerous depositions taken demonstrate beyond cavil that they made no fraudulent representations to Teledyne, and did nothing to induce it to enter into the subcontract. Plaintiff, of course, argues that there is a more than adequate basis in the record

thus far developed for concluding that the defendants participated in the allegedly fraudulent scheme.

At this juncture, then, it will be useful to review the familiar standards that govern motions for summary judgment. I must at the outset acknowledge the pertinence of Professor Moore's observation that "[s]ummary judgment is apt to be inappropriate in an action based on a complex scheme of fraud where the court is asked to decide the motion on lengthy affidavits and documents and voluminous depositions."[8] Moore adds the obvious *caveat* that the party opposing summary judgment cannot rely merely on complexity; he must proffer evidence that raises triable issues of fact.

■■■ The prevailing rule, then, is that allegations of fraud do not readily lend themselves to resolution by way of summary judgment. Clyde v. Hodge, 413 F.2d 48 (3rd Cir. 1969). Fraudulent intent is an issue best determined by a careful examination of the underlying facts and an evaluation of the credibility of the parties and witnesses. Categorical denials of such intent contained in affidavits (or, as here, in depositions) scarcely provide an adequate basis for such a determination. Associated Hardware Supply Co. v. Big Wheel Distributing Co., 355 F.2d 114 (3rd Cir. 1966); F. S. Bowen Electric Co. v. J. D. Hedin Construction Co., 114 U.S.App.D.C. 361, 316 F.2d 362 (1963); Paine-Henderson v. Eastern Greyhound Lines, 320 F. Supp. 1138 (D.S.C.1970). See also Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, at 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Cross v. United States, 336 F.2d 431 (2nd Cir. 1964). In order to establish that no genuine issue of material fact exists, defendants must sustain a heavy burden. Weiss v. Kay Jewelry Stores, Inc., 152 U.S.App. D.C. 350, 470 F.2d 1259 (1972).

■■■ The standard against which the liability of the individual defendants is

---

7. Anton deposition, p. 130.

8. 6 Moore's Federal Practice ¶ 56.17[27].

to be measured is also a familiar one. It is now well settled that an officer or director is not, merely by virtue of his office, liable for the tortious acts of the corporation. He must direct, authorize, or in some meaningful sense participate actively in the assertedly wrongful conduct. Armour and Company v. Celic, 294 F.2d 432 (2nd Cir. 1961); Hagemeyer Chemical Co. v. Insect-O-Lite Co., 291 F.2d 696 (6th Cir. 1961); Lobato v. Pay Less Drug Stores, 261 F.2d 406 (10th Cir. 1958); Lahr v. Adell Chemical Co., 300 F.2d 256 (1st Cir. 1962); Lemmons v. Zurich Insurance Co., 403 F.2d 512 (5th Cir. 1968); United States Liability Insurance Co. v. Haidinger-Hayes, Inc., 1 Cal.3d 586, 83 Cal.Rptr. 418, 463 P.2d 770 (1970). The question presented for determination, then, is whether the papers before me raise any triable issues of fact with regard to the participation of the moving defendants in the alleged fraud perpetrated by Eon.

In reviewing the deposition testimony submitted by both sides, I am obliged to view the facts in the light most favorable to the party opposing summary judgment. United States v. Diebold, 369 U.S. 654, 82 S.Ct. 993, 8 L. Ed.2d 176 (1962). Given that standard, I have concluded that the evidence of defendants' involvement, although scarcely extensive, is sufficient to defeat their motion. My review of the evidence that follows should not, of course, be construed as even hinting at a determination of the ultimate liability of the defendants; it in no way constitutes factual findings. The function of a district judge in a summary judgment motion thus seems to have escaped the defendants, whose arguments appear to assume that the position supported by a preponderance of the evidence prevails.

Defendants' view of the evidence is relatively straightforward. They concede that Teledyne possesses a valid breach of contract claim against Eon, but argue that Teledyne's only recourse is to pursue it as a general creditor in the bankruptcy court. In this action, it is claimed, Teledyne is merely seeking to circumvent the bankruptcy proceedings to reach the personal assets of the individual defendants, an argument which conveniently ignores the six month hiatus between the filing of this action and the institution of Eon's Chapter XI proceedings. The unstated premise underlying defendants' arguments is that because they did not participate in the face to face negotiations of May 10–12 leading up to the signing of the subcontract, they cannot be held liable. Thus Podell, Srybnik and Waller point out that they were not present in Los Angeles and were unaware of the terms arrived at by the parties. Anton argues that he did not arrive on the scene until approximately 1:00 P.M. on May 12, by which time negotiations were effectively concluded. His sole function was thus the purely ministerial one of signing the contracts and no intent to defraud can be inferred from his actions.

Plaintiff's view of the facts, and of defendants' involvement in the assertedly fraudulent scheme, is more complex. It is first necessary, however, to set forth briefly plaintiff's theory regarding the nature of the fraud. A principal concern of the Teledyne negotiators was Eon's ability to fulfill its commitments under the subcontract. During the negotiations, Rouse and Coleman had obtained a Dun and Bradstreet report on Eon, and learned that, as a credit risk, it was something less than the Rock of Gibraltar.[9] They thus sought, and were given, assurances that there was enough money owing to Eon under the main contract to pay Teledyne.[10] Plaintiff argues vigorously that these assurances were false, and adduced considerable evidence at the depositions in support of its contention. As is not unusual in Army

9. Rouse deposition, p. 72; Coleman deposition, p. 19.

10. Rouse deposition, p. 75. Notes taken by Rouse during the negotiations (Deposition exhibit "E") indicate that this representation was made to the Teledyne representatives by Leonard.

contractual relations, Eon had received a number of "progress payments" from the government. It is undisputed that progress payments may amount to, but not exceed, 85% of the selling price of the product shipped. The government then pays the remaining 15% upon the final delivery of the goods. According to the testimony of Robert Walck,[11] division controller of American Marc at the time of the events in question, on May 7, 1971 Eon had submitted to the government "Progress Payment Request No. 21." Walck had prepared this document (DD Form 1195) as he had all those previously submitted. The document discloses that the total value of the contract was $3.5 million. Eon had previously delivered and been reimbursed for goods totalling $1.3 million. The value of the items not yet delivered was thus approximately $2.2 million. However, "Request No. 21" also discloses that Eon had received previous progress payments of $1.7 million, and was by that very document submitting a further request for $185,000. Thus, at the time of the execution of the Teledyne subcontract, the amount remaining to be paid Eon under the main contract after the requested payment was slightly more than $300,000.[12]

Plaintiff also claims that Eon's representation that it owned the inventory which it sold to Teledyne was fraudulent. It points out that the 1971 Financial Statement of American Marc, dated February 28, 1971, contains the following footnote (at p. 10) regarding inventory: "Progress payments for government contract work have been offset against inventory as under the terms of the contract title to certain of the inventory is vested in the government." Teledyne contends that Eon failed to advise it that its title to the inventory was, at the very least, encumbered.

By my reading of the deposition testimony, there is sufficient evidence of: (a) the defendants' knowledge of American Marc's financial condition in general and of the generator set contractor in particular, and (b) defendants' involvement in and approval of the subcontract negotiations to raise triable issues of fact with regard to both of these questions. I shall now review that evidence briefly.

Once it was decided in late 1970 to terminate the operations of the American Marc Division, the Eon board became interested in subcontracting the balance of the generator set contract at a unit price lower than they were being paid by the Army. This is reflected in the minutes of the board's meeting of April 21, 1971.[13] In pursuit of this end, members of the Eon board contacted several companies viewed as potential subcontractors.[14] At a full trial it may well develop that the defendants had some general familiarity with the generator set contract[15] and were aware of the desirability of obtaining a subcontract for it.

There is some evidence that the Eon board was aware of the status of the generator set contract even prior to the negotiations of May 10–12. Leonard testified[16] that he received periodic reports from Walck regarding the amount of money left in the contract and further testified that these reports were submitted to Eon in New York, in one of two ways. Leonard would either mail them to Anton, or he would bring the reports to Eon board meetings, where they would be discussed. By way of corroboration, Walck testified[17] that he prepared routine monthly financial reports for American Marc which were submitted to Anton and Leonard. In addition to reflecting monthly profit and loss, cash flow, etc., they reflected the

11. Walck deposition, p. 21 et seq.

12. Id.

13. Quoted in Anton deposition, p. 204.

14. Podell deposition, pp. 27–29; Leonard deposition, pp. 17–27.

15. Podell testified (at pp. 27–8) that the generator set contract was the only one left to American Marc by the end of 1970.

16. Leonard deposition, p. 35 et seq.

17. Walck deposition, p. 36 et seq.

progress payments to date under the generator set contract.[18]

The papers before me also provide some evidence of the defendants' awareness of, and involvement in, the execution of the subcontract with Teledyne. With regard to participation in the negotiations and signing, the defendants fall into two categories: Anton on the one hand, and Podell, Srybnik and Waller on the other. As for Anton, there is testimony, both his own and others',[19] that upon his arrival in Los Angeles he was fully apprised of the results of the negotiations that had taken place up to that point. According to Rouse,[20] the representations made by Leonard regarding the ownership of the inventory and amounts remaining under the generator set contract were reviewed with Anton.

With regard to the remaining defendants, it appears that Leonard phoned Anton, presumably on May 11, and advised him that the negotiations were making progress and that an agreement was near. Leonard's testimony[21] suggests that in his telephone call he set forth the substance of the negotiations in some detail, for he stated that even before his arrival Anton knew of Teledyne's proposal for the establishment of a special account. Leonard also stated he understood that Anton had reviewed the proposed contract with the Eon board.[22] Anton himself stated that he conferred with the members of the board by telephone after receiving Leonard's call, and that all concurred in his decision to go to Los Angeles to sign the subcontract.[23]

Upon Anton's return from Los Angeles, the subcontract remained a matter of importance to the board. According to Anton, its members saw both the purchase order and the inventory agreement, and the matter was discussed "continuously."[24] Although he was unable to locate the relevant entry in the minutes of the board, Anton also testified that it approved the Teledyne subcontract.[25]

The record, then, viewed in a light most favorable to plaintiff, virtually bristles with triable issues of fact that make impossible the granting of summary judgment on plaintiff's first cause of action. This case is, in several respects, comparable to the recent case of Ferguson v. OmniMedia, Inc., 469 F.2d 194 (1st Cir. 1972). There plaintiff had purchased stock of OmniMedia, the corporate defendant, allegedly in reliance upon fraudulent misstatements made in a balance sheet. The only question presented to the First Circuit was the liability of a single director, the wife of the corporation's president, in whose favor the district court had granted summary judgment. The district court had relied on the defendant's affidavit which disclaimed knowledge of the fraudulent balance sheet and further denied any participation in the financial affairs of the corporation. The latter denial was disputed in an affidavit submitted by the plaintiff. In reversing the grant of summary judgment, the court of appeals

18. The defendants' depositions offer a conflicting account. For example, Srybnik testified (pp. 22–23) that although he knew that American Marc was progress billing the government, he had no idea how much money American Marc had received in this manner and that he was unaware that the subject was ever raised at a board meeting. He also testified that the directors never received any reports regarding the amount of money remaining to American Marc under the contract.

19. Anton deposition, p. 32; Rouse deposition, p. 31.

20. Id.

21. Leonard deposition, pp. 37–38.

22. Id., p. 28.

23. Anton deposition, pp. 30–31.

24. Id., p. 43.

25. Id., p. 20. This proposition is vigorously disputed. Podell (pp. 46–47) testified that the subcontract was never passed upon by the board, and Srybnik (p. 38) stated that it was never "formally ratified". (It is not clear from the record whether he meant by this to exclude the possibility of informal approval.)

noted that the facts did not exclude the defendant's possible participation in a conspiracy to violate the securities laws. The court reasoned as follows:

"[Defendant] was an officer and director of OmniMedia at relevant times. During the period in 1968 when her husband and co-director has been found to have defrauded appellant, she demonstrated in conversations (according to appellant's affidavit) knowledge of the business of the corporation and of appellant's stock ownership. She also was present at and recorded the minutes of one or more corporate meetings at which allegedly improper actions were taken. These circumstances give rise to more than a passing inference that she may have known about and participated in any illegal scheme that was afloat to defraud the appellant." 469 F.2d at 197.

Here too, there is at the very least a "passing inference" that the individual defendants, Anton particularly but the others as well, knew that insufficient funds remained payable to Eon under the contract and knew further that Eon's undertaking with Teledyne implied precisely the opposite. Defendants' motion for summary judgment on the first cause of action is accordingly denied.

### III.

■ Plaintiff alleges in its second cause of action that defendants represented that all government payments to° Eon would be placed in a "special account," and that no monies would be withdrawn from this account until Teledyne's invoices were paid in full. The failure to fulfill these obligations, it is charged, constitutes a breach of fiduciary duty, and the use of the funds for other purposes is said to amount to the act of conversion. Defendant acknowledges the existence of such an account, but contends that it never undertook to give priority to Teiedyne's invoices or to restrict the use of the account in the manner which plaintiff describes.

Reference has already been made, in Part I of this opinion, to Leonard's letters of May 13 and May 25, of which the latter is set out at footnote 6, supra. I shall only attempt here to point up some of the ambiguities and misunderstandings which surround the establishment of this account and which, in my view, necessarily preclude the granting of summary judgment.

It seems well established that during the negotiations of May 10–12 the Teledyne representatives were concerned with Eon's ability to meet its financial obligations under the proposed subcontract.[26] As Leonard conceded [27] it was understood by all parties at the negotiations that American Marc had no funds with which to pay Teledyne except those forthcoming from the government under the generator set contract. The Teledyne representatives therefore proposed that the special account be established, into which the progress payments would be deposited and from which the Teledyne invoices would be paid. This proposal was accepted by Eon, as Leonard's letters of May 13 and 25 reflect.

There is disagreement, however, as to how the account was to be administered. Leonard [28] and Anton [29] both testified that it was never Eon's intention that no monies be expended from the account until after payment to Teledyne. The testimony of Walck, American Marc's controller,[30] describes the operation of the account in detail. In 1971 American Marc had two accounts, one at the United California Bank, the other at Bank of America. The Bank of America account was established at some point after American Marc obtained the generator set contract in 1969. It was apparently

26. Rouse deposition, p. 73; Coleman deposition, p. 19.

27. See letter from Leonard to Coleman, dated October 11, 1971, deposition exhibit 20i.

28. Leonard deposition, pp. 35–37.

29. Anton deposition, pp. 47–55.

30. Walck deposition, pp. 47–59.

set up at the request of Canron Limited, a supplier of American Marc under the contract and was subsequently used to pay Canron and another supplier, Electromagnetic Industries, upon the receipt of progress payments from the government. Although some other funds were paid into the Bank of America account, it was essentially a depository for progress payments. It was this account, then, that was used by American Marc to meet Teledyne's request; no new account was established. It further appears that the United California Bank account was closed in August or September of 1971. Thereafter, the Bank of America account was used for various corporate purposes, such as paying utility bills or paying the salary of employees.

Defendants' position, then, is that the testimony of various Eon officers establishes that there was never any intention of giving Teledyne's invoices preference. I am convinced, however, that the documentary evidence alone is sufficient to call that into question. The May 25 letter from Leonard to the Bank of America is a model of ambiguity: it is equally consistent with the interpretations advanced by both sides. An October 11, 1971 letter from Leonard to Coleman is less ambiguous, however. In closing, Leonard states: "We will pay you as we agreed and you have the largest bank in California acting as monitor in your behalf." Plaintiff may legitimately question what monitoring function was performed if the account was administered in the manner in which the Eon executives have explained it here. Defendants' version also leaves unexplained the question of why Rouse and Coleman, obviously concerned with the certainty of Eon's payments under the subcontract, would have accepted a "special account" arrangement which provided no security whatsoever. Further explication of the meaning of the special account provisions must therefore abide the trial.

There are, however, legal as well as factual problems inherent in the second cause of action. Both conversion and breach of fiduciary duty are asserted in this count, and defendants attack the legal sufficiency of each of these theories.

■ A word about the applicable law is in order first. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), teaches that federal courts must follow the conflict of laws rules of the states in which they are situated. The leading New York case involving choice of law rules for contracts is Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954). There the New York Court of Appeals embraced the "grouping of contacts" theory: "[u]nder this theory, the courts, instead of regarding as conclusive the parties' intention or the place of making or performance, lay emphasis rather upon the law of the place 'which has the most significant contacts with the matter in dispute.'" It would appear that the state possessing the most significant contacts with the arrangement here at issue is California. The contracts were negotiated entirely in California, and signed there. Teledyne is a California corporation with its principal place of business in Los Angeles; although Eon is a New York corporation, its American Marc Division was located in California and had its headquarters in Inglewood. Another important consideration [31] is that the application of California law seemed to be within the contemplation of the parties. It will be recalled that the parties executed two documents, a purchase order and an inventory agreement. Although the former contains no reference to choice of law, the inventory agreement provides, in its final paragraph, that "[t]his contract is entered into in accordance with the law of the State of California and such law shall govern this contract." Although this provision technically applies to the inventory agreement, it might not be unwarranted to infer that it accurately expresses the parties' intentions with regard to both of the agreements consummated on May

---

31. See Restatement Second, Conflict of Laws § 187.

12. I therefore now turn to a consideration of the California law.

Teledyne contends that Eon's undertaking to set up a special account established a "fiduciary relationship" between the parties, and that Eon's subsequent use of funds in this account for other purposes constituted a "breach of trust." The standard definition of "fiduciary relations" can be found in Twomey v. Mitchum, Jones & Templeton, Inc., 262 Cal.App.2d 690, 69 Cal. Rptr. 222 (1968): "Confidential and fiduciary relations . . . may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another. The very existence of such relations precludes the party in whom trust is reposed from participating in profit or advantage resulting from his dealings." A similarly amorphous standard can be found in other jurisdictions as well. See, e. g., Vargas v. Esquire, 166 F.2d 651 (7th Cir. 1948), cert. denied 335 U. S. 813, 69 S.Ct. 29, 93 L.Ed. 368 (1948); Rader v. Boyd, 252 F.2d 585 (10th Cir. 1957); Hamby v. St. Paul Mercury Indemnity Co., 217 F.2d 78 (4th Cir. 1954).

█ Although California law provides no clear guidelines, I have concluded that if the agreement establishing the trust account is given the interpretation which plaintiff urges, it adequately supports the existence of a fiduciary relationship. The California courts, it is true, have not been eager to superimpose fiduciary duties upon parties engaged in purely commercial dealings. The best example of this reluctance is Gonsalves v. Hodgson, 38 Cal.2d 91, 237 P.2d 656 (1951). In that case, plaintiff and his partners contracted with the defendant for the building of fishing boats. Upon delivery the boats proved defective, and plaintiff sought unsuccessfully to induce the defendant to make the necessary repairs. Plaintiff then brought suit, alleging, inter alia, a breach of fiduciary duty. The California Supreme Court concluded that no fiduciary relationship existed between the parties. Citing I Bogert Trusts and Trustees, § 17, it stated:

"There is no fiduciary relation in the case of debt or other contract duty. The rights and duties of parties to a contract may generally be freely transferred. The trustee cannot assign his trusteeship or delegate the performance of his duties . . . . There is no rule that parties to a contract may not act for their own interest during the execution of the contract. They have no duty of loyal representation of the opposing party in the relationship." 237 P.2d at 661.

Gonsalves, however, stands for no more than the unimpeachable proposition that a contract does not ordinarily give rise to a fiduciary relationship, and its corollary that a debt is not a trust. Downey v. Humphreys, 102 Cal.App.2d 323, 227 P.2d 484 (1951), presents a factual setting somewhat closer to the case at bar. This was an action by the liquidator of an insurance company against an agent to recover unremitted insurance premiums. With the knowledge and consent of the various companies he represented, the agent failed to segregate the premiums payable to any one company in a separate account. Rather, he commingled all premiums collected with his personal funds in a general commercial account, from which he paid the companies. The court held the agent to be a mere debtor rather than a fiduciary largely, it appears, because he was permitted unrestricted use of the funds collected. It held: "If a person receives money and it is the intention that he shall have the unrestricted use thereof, being liable to pay a similar amount to a third person, a debt is created."

One may thus infer, from the negative pregnant of this holding, that an insurance agent the use of whose funds is restricted does act in a fiduciary capacity. Cf. Morgan v. American Fidelity Fire Insurance Co., 210 F.2d 53 (8th Cir.

1954). One may further infer that where a party to a contract undertakes to make payments out of a fund specially segregated for a specified purpose, he acts in a fiduciary capacity. See Whiting-Mead Co. v. West Coast Bond and Mortgage Co., 66 Cal.App.2d 460, 152 P. 2d 629 (1944); Ralph C. Sutro Co. v. Paramount Plastering, Inc., 216 Cal. App.2d 433, 31 Cal.Rptr. 174 (1963). I therefore conclude that Teledyne's contentions, if taken as true, are sufficient to allege a breach of fiduciary duty. Under plaintiff's theory, the progress payments were to be segregated in a special fund the principal purpose of which was the payment of Teledyne's invoices. If plaintiff can sustain this theory at trial, it will have adequately demonstrated the existence of a fiduciary relationship. If, as defendants contend, the "special account" was to be used to pay Teledyne, among others, with no particular preferences implicit in its establishment, *Downey* would compel a finding that no such relationship existed.

Plaintiff's allegations of conversion are similarly sufficient. Conversion has been defined by the California courts as "any act of dominion wrongfully asserted over another's personal property in denial of or inconsistent with his rights therein . . . . In order to establish a conversion, the plaintiff must show an intention or purpose to convert the goods and to exercise ownership over them, or to prevent the owner from taking possession of his property." Oakes v. Suelynn Corporation, 24 Cal.App.3d 271, 100 Cal.Rptr. 838 (1972); Itano v. Colonial Yacht Anchorage, 267 Cal.App. 2d 84, 72 Cal.Rptr. 823 (1968); Zaslow v. Kroenert, 29 Cal.2d 541, 176 P.2d 1 (1946); Newhart v. Pierce, 254 Cal. App.2d 783, 62 Cal.Rptr. 553 (1967). See also Citizens National Bank v. Osetek, 353 F.Supp. 958 (S.D.N.Y.1973).

■■ It is well settled that in an action for conversion, the plaintiff must establish that he had possession or the right to immediate possession of the property at the time of the alleged conversion. Eistrat v. Irving Lumber & Moulding, Inc., 210 Cal.App.2d 382, 26 Cal.Rptr. 520 (1962); Gardena Valley Airport v. All American Sports Enterprises, 230 Cal.App.2d 478, 41 Cal.Rptr. 93 (1964); Scutt v. Bassett, 86 Cal. App.2d 373, 194 P.2d 781 (1948); General Motors Acceptance Corp. v. Dallas, 198 Cal. 365, 245 P. 184 (1926). Defendants claim here, of course, that Teledyne did not become the "owner" of the progress payments as soon as they were paid into the special account, and thus do not meet the requisites for an action in conversion. This overlooks the doctrine, equally well settled, that an action may be brought by a person who, although not in possession, had a special interest in the property giving him a right to possession at the time of the conversion. Pope v. National Aero Finance Co., 236 Cal.App.2d 722, 46 Cal. Rptr. 233 (1965); Carvell v. Weaver, 54 Cal.App. 734, 202 P. 897 (1921). Whether or not Teledyne possessed such a special interest here depends, in turn, on my ultimate determination of the function and purpose of the special account. If the account was to be maintained as plaintiff contends, it would appear that Teledyne possesses a special interest, short of actual ownership, sufficient to maintain an action for conversion. See National Bank of New Zealand v. Finn, 81 Cal.App. 317, 253 P. 757 (1921); Camp v. Ortega, 209 Cal.App.2d 275, 25 Cal.Rptr. 873 (1962); Driver v. Acquisto, 145 Cal.App.2d 304, 302 P.2d 387 (1956); McGaffey Canning Co., Inc. v. Bank of America, 109 Cal.App. 415, 294 P. 45 (1930). In testing the legal sufficiency of the pleadings their allegations must be taken as true, and I therefore conclude that plaintiff has stated such a cause of action.

In conclusion, then, defendants' motion for summary judgment on the second cause of action is denied in all respects.

## IV.

At issue in plaintiff's Rule 37(a)(2) motion is defendants failure to respond

to the request for production of documents sought in plaintiff's original notice to produce served in August, 1972. Seven sets of documents are sought, and they will hereafter be identified by the corresponding paragraph number in the notice: (1) Eon's Certificate of Incorporation; (2) Eon's By-Laws; (5) Minutes of Eon board meetings; (6) minutes of Eon executive committee meetings; (33) completed DD 1195s or other documents requesting progress payments; (38) documents, including bank accounts, showing disbursement of funds received under the generator set contract; and (39) liquidation payments for deliveries made under the contract.

The only question of any moment is raised at the threshold by the individual defendants. They argue that the order of the bankruptcy court staying all actions against Eon forbids the production of the documents in question. This contention, I have concluded, is meritless. 11 U.S.C. § 714,[32] it is true, enables the bankruptcy court to stay all actions against the debtor pending a final decree in the arrangement proceeding. See, e. g., In Re Zeckendorf, 326 F.Supp. 182 (S.D.N.Y.1971); United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833 (S.D.N.Y.1966). The purpose of the stay is to prevent interference with, or diminution of, the debtor's property during the pendency of the Chapter XI proceeding. In Re Krull, 21 F.Supp. 377 (M.D.Pa.1937). It is intended to prevent a creditor from defeating the jurisdiction of the bankruptcy court over the debtor's property by instituting another action in a different forum. In Re Bargain City, U.S.A., Inc., 212 F.Supp. 111 (E.D.Pa.1962); First National Bank in Houston, Texas v. Lake, 199 F.2d 524 (4th Cir. 1952). It is obvious, I submit, that none of

these purposes would be defeated by requiring Eon to submit copies of the documents requested by plaintiff. Such documents will be used only in plaintiff's prosecution of its action against the individual defendants; cognizant of the stay, Teledyne is not seeking to proceed against Eon. So long as the purpose served by the stay, the preservation of Eon's property from adverse judgment, is observed in these proceedings, I see no obstacle to requiring this limited participation of Eon here.

The earlier discussion of the facts underlying this action should suffice to demonstrate the relevance of each of plaintiff's documentary requests. Indeed, I do not understand the defendants to contest the relevance of the documents requested in paragraphs 33, 38, 39. The affidavit of Richard Weinberger, Esq., counsel for defendants, concedes at p. 21 that the only objection interposed to the satisfying of these requests is based on the stay of the bankruptcy court. Because the role which the directors of Eon played is of critical importance, plaintiff is entitled to the production of Eon's by laws and Certificate of Incorporation, requested in paragraphs (1) and (2). Those documents might conceivably shed light on the duties and responsibilities of the officers and directors. The importance of the minutes of the Eon board meetings, requested in paragraph (5), is too obvious to require extended discussion; they are surely essential to a determination of the involvement of these defendants. As for the material requested in paragraph (6), the minutes of Eon's executive committee meetings, counsel has represented that Eon has no such committee. In the absence of evidence to the contrary I shall accept this representation. Plaintiff's motion is thus granted except as to paragraph (6).

---

32. 11 U.S.C. § 714:
    "§ 714. Stay of actions
    The court may, in addition to the relief provided by section 29 of this title and elsewhere under this chapter, enjoin or stay until final decree the commencement or continuation of suits other than suits to enforce liens upon the property of a debtor, and may, upon notice and for cause shown, enjoin or stay until final decree any act or the commencement or continuation of any proceeding to enforce any lien upon the property of a debtor."

**204**

*Conclusion*

To summarize, defendants' motion for summary judgment dismissing the action is denied. Plaintiff's motion to compel the inspection of documents is granted except as to the materials sought in paragraph (6) of its original request.

It is so ordered.