**John Whitney STILLMAN d/b/a Stillman International, Plaintiff,**

v.

**NICKEL ODEON, S.A., Jose Esteban Alenda, Jose Luis Garci also known as Jose Luis Garcia Munoz, Enrique Herreros, Simon/Reeves/Landsburg Productions Inc., Richard A. Waldberg and Shapira Films, Ltd., Defendants.**

No. 83 Civ 7786 (LBS).

United States District Court, S.D. New York.

April 30, 1985.

Rachlin & White, New York City, for plaintiff; Howard W. Rachlin, Thomas D. White, New York City, of counsel.

Solin & Breindel, P.C., New York City, for defendants; Alan Seife, Claude M. Tusk, New York City, of counsel.

OPINION

SAND, District Judge.

Plaintiff, a New York foreign language film licensing and sales agent, has instituted this action based on an alleged oral agreement entered into by plaintiff and defendant Nickel Odeon, a Spanish film company owned by defendants Alenda and Garci, making plaintiff the exclusive licensing agent for a Spanish film entitled "Volver a Empezar." [1] Defendants have moved for summary judgment with respect to plaintiff's contract claims.[2] Defendants contend that Spanish law governs the resolution of plaintiff's contractual claims and that such claims must be dismissed pursuant to Spanish legal standards. As an initial matter, this Court must first determine what law is to be applied in resolving the parties' contractual dispute. For the reasons discussed below, we conclude that the law of New York should be applied. Accordingly, defendants' motion for summary judgment is denied.

*Introduction*

The first issue which this Court must resolve is what law to apply in the instant action. At the October 25, 1984 oral argument of this motion, the parties agreed that this choice of law issue would be separated from all other issues in the case and submitted to the Court for resolution. The parties have stipulated, by the submission of certain documents, affidavits, and testimonial evidence, to the facts upon which this Court is to base its decision.[3] The

---

1. Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332.

2. In addition to plaintiff's contractual claims, plaintiff has asserted a claim against Nickel Odeon for the reasonable value of services performed by plaintiff in connection with his efforts to license the film for distribution (claim 3) and a claim against defendants Nickel Odeon, Alenda, Simon/Reeves/Landsburg Productions, Inc. (hereinafter "S/R/L") and Herreros for libel and conspiracy to libel (claims 20–25). Defendants have not moved for summary judgment with respect to these claims.

3. The stipulated facts include the following:
   1) Pages 73–94 of the transcript of the deposition of plaintiff John Whitney Stillman;
   2) Paragraphs 4 and 5 of the affidavit of Howard W. Rachlin, Esq., sworn to October 19,

1984, in opposition to defendants' summary judgment motion;
3) That portion of paragraph 9 of the Rachlin Affidavit that reads: "The contract specifically provided that plaintiff would be the exclusive licensing agent of the Film everywhere in the world *except Spain. Thus, the contract was to be performed totally outside of Spain and primarily from plaintiff's offices in New York.* In addition, defendant NICKEL ODEON breached its contract of May, 1982 with plaintiff by authorizing persons and/or entities (*e.g.,* TWENTIETH CENTURY–FOX ENTERTAINMENT INC. ("FOX"), HERREROS and SIMON) other than plaintiff to license the Film in North America, Latin America, Israel and, in short, everywhere in the world *except* Spain." (emphasis in original);

parties' stipulation as to these facts has been made solely for purposes of resolving this choice of law question. The Court has also examined the affidavits of plaintiff's and defendants' Spanish law experts in making this determination. *See* F.R.Civ.P. 44.1.

### Facts [4]

Plaintiff is engaged in the business of licensing foreign language films for distribution on an international basis. On May 5, 1982, plaintiff and Irene Stillman, his wife, met with defendants Garci and Alenda at the offices of defendant Nickel Odeon in Madrid, Spain, to discuss the defendants' film "Volver a Empezar" ("To Begin Again" or "Begin the Beguine") (hereinafter "the Film"). Garci (the Film's director) and Alenda (the Film's producer) are the sole shareholders and officers of Nickel Odeon. These parties met again the following day at the offices of Nickel Odeon. At this meeting, plaintiff entered into an oral agreement with Nickel Odeon to distribute the Film on a worldwide basis, except for Spain. Rachlin Affidavit ¶ 5; Dep. Stillman 75–79. According to plaintiff's deposition testimony, Nickel Odeon agreed to pay plaintiff a commission equal to 20% of the gross revenues (less special expenses) generated by plaintiff from his licensing of the Film for distribution. Neither party suggested that this agreement be reduced to writing at that time. Dep. Stillman 79–80. The parties did agree that the duration of their agreement would be determined at the upcoming Cannes Film Festival in France. Plaintiff thereafter commenced his promotional efforts in anticipation of the film festival.

On May 19, 1982, plaintiff and Irene Stillman met with Alenda in Cannes, France. At that meeting, the parties agreed orally that the term of their agreement would run from May 6, 1982 to January 15, 1983, with a provision for automatic six-month renewal periods unless Nickel Odeon notified plaintiff of its intention to cancel the agreement 45 days prior to its termination. This agreement was not reduced to writing.

During the following year, plaintiff engaged in extensive efforts to license the Film for distribution all over the world. Plaintiff wrote to various film production companies and other interested parties as part of his promotional and licensing efforts. *See, e.g.,* PX 47 (letter from Australian production company); 84 (telegram from Czechoslovakian film commission); 102 (letter from Netherlands broadcasting company); 103 (letter from Norwegian broadcasting company); 104 (letter from Belgian film company); 105 (letter to West German film company); 109–13 (letters to Swedish film company); 114 (letter to Switzerland film company); 115 (letter to French film company); 116 (letter to British film institute); 129 (letter to Japanese film company). Plaintiff attended various film festivals as well. *See, e.g.,* PX 20 (Montreal); 104, 106 (Berlin); 107–10 (Goteborg); 133 (Milan). Plaintiff's promotional efforts were reported in at least two issues of Variety Magazine, a major entertain-

---

4) Exhibits G, H, J, K, L, M, N, O, P, S, T, U, FF, GG and JJ to the Rachlin Affidavit;

5) Exhibits B and C to the affidavit of Alan Seife, Esq., sworn to September 26, 1984, in support of defendants' motion; and

6) The documents marked in the proposed joint pretrial order as Plaintiff's Exhibits 5, 13, 18, 20, 25–27, 33, 46, 47, 57, 58, 64–66, 79, 80, 84, 86, 100–16, 123, 124, 127–45, 147, 148, 151 and 153–56.

*See* Letter of Claude M. Tusk, Esq., November 1, 1984, to this Court; *see also* Transcript of Proceedings dated October 25, 1984.

The parties have also agreed that this Court "may draw any inferences which it deems appropriate, make any findings of fact, and resolve any disputes arising from the underlying documents submitted herewith, with the same force and effect as if the Court had heard the testimony of the witnesses in a trial conducted to the Court." *See* Transcript of Proceedings dated October 25, 1984, at 2.

For purposes of this motion, we assume that New York law would permit enforcement of the contract alleged by plaintiff notwithstanding the parties' failure to reduce their agreement to a signed writing. *See* discussion at pages 1056–1057 *infra.*

**4.** This statement of facts does not purport to be a complete description of all the events underlying the instant case, but includes only those facts which we consider necessary to resolve the choice of law question.

ment industry publication. Rachlin Aff. Ex.G. (reporting that film was "repped for world sales by Stillman International of New York"). Plaintiff also communicated to Nickel Odeon his efforts to promote and license the Film on a worldwide basis. Rachlin Aff. ¶ 5; PX 25, 123.

Plaintiff's efforts bore fruit in the form of an agreement with Richard A. Waldberg to distribute the Film in Australia, Rachlin Aff.Ex.H, and an agreement with Shapira Films, Ltd. to distribute the Film in Israel. *Id.* Ex.J. The former agreement was entered into on May 23, 1982, in Cannes, France; the latter agreement was entered into on December 31, 1982, in New York City. Both agreements indicated that payments by the respective licensees were to be made to plaintiff's New York office or New York bank account (or, in Shapira's case, to Nickel Odeon, if plaintiff so specified). Copies of these agreements were forwarded to Nickel Odeon. Rachlin Aff. Ex.J.

Sometime during late July or early August of 1982, plaintiff drafted a representation agreement which embodied the terms of the oral agreement described above. Seife Aff.Ex.G; Dep. Stillman 88–90. Plaintiff presented this agreement to Garci at the Montreal Film Festival in August 1982. Rachlin Aff. ¶ 5. This agreement was not signed by either party to the alleged oral agreement. On August 30, 1982, Nickel Odeon entered into a written agreement with Twentieth Century Fox International Corp., granting Fox exclusive rights to distribute the Film in various Latin American countries. PX 5. In December 1982, plaintiff wrote to Alenda, describing his efforts to promote and license the Film worldwide and asking him to sign the representation agreement which he had presented to Garci in Montreal. PX 25. The agreement was not signed by either party.

On February 16, 1983, plaintiff and Nickel Odeon entered into a written agreement which "confirm[ed] in writing that Whit Stillman ... has acted with the authorization of Nickelodeon S.A. in the negotiation of the sale of our film "Volver a Empezar" (Begin the Beguine), to the countries of Australia and Israel" and stated that Nickel Odeon "com[m]its itself to fulfill the clauses of the contracts" with Australia and Israel. Rachlin Aff.Ex.L. This agreement contained sales commission terms similar to those orally agreed upon previously by the parties. It also specified particular payment terms with respect to the Australian and Israeli sales contracts and stated that failure to comply with these terms would result in Nickel Odeon's cancellation of the contracts. *Id.*

On March 1, 1983, Nickel Odeon cancelled its written agreement with plaintiff, claiming that Waldberg and Shapira had failed to comply with its payment terms. In response, plaintiff asserted that Waldberg and Shapira had complied with the contract terms and stated that he would pursue legal action to enforce its May 6, 1982 oral agreement if defendants did not honor the Australian and Israeli film distribution agreements. PX 24.

On May 23, 1983, during the Cannes Film Festival in France, Nickel Odeon entered into an agreement with Waldberg granting him the right to distribute the Film in Australia. Rachlin Aff.Ex.U. This agreement was virtually identical to the film distribution agreement previously entered into by plaintiff and Waldberg, except that plaintiff was not a party to the Nickel Odeon/Waldberg agreement.

### Discussion

The first issue raised by defendants' motion for summary judgment is which substantive law is to be applied in determining the legal validity of plaintiff's claims. A federal court sitting in a diversity case must apply the choice of law rules of the state in which the case is brought, in this case New York. *See Klaxon Co. v. Stentor Electric Manufacturing Co. of North America,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York courts apply the "paramount interest" test in determining the law to be applied in contract disputes. *See Intercontinental*

*Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969). In *Daystrom*, the New York Court of Appeals applied New York's statute of frauds provision governing brokers and finders, rather than New Jersey law (which lacked similar provisions), to bar recovery of a finder's fee by a New York corporation from a New Jersey corporation. The court began by noting that New York no longer follows traditional choice of law rules which provided that matters bearing upon contract execution, interpretation and validity would be determined according to the law of the forum where the contract was made (*i.e.*, the forum in which the last act necessary to make it binding takes place) and that matters relating to performance were regulated by the forum in which the contract was to be performed. According to the court, "the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contacts which obtain significance in defining state interests are those which relate to the purpose of the particular law in conflict." 300 N.Y.S.2d at 825, 248 N.E.2d at 582 (*citing Miller v. Miller*, 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 879 (1968) ). The court found that the dispute had sufficient contacts with New York to give that state a substantial interest in applying its law. The court noted that plaintiff was a New York corporation whose business was based in New York, the alleged agreement arose out of a New York newspaper advertisement and was consummated at a meeting in a New York restaurant, and that the services performed by plaintiff were substantially rendered in New York. The court concluded that applying New York law would further the policy underlying its statute of frauds to "protect principals in business transactions from unfounded claims and thereby encourage use of New York as a national and international business center," whereas New Jersey had "no interest in having its lack of protection for its residents used to establish their liability in a suit brought by residents of other jurisdictions when the laws of the forum State offer a completed

defense to the action." 300 N.Y.S.2d at 827–28, 248 N.E.2d at 583–84.

■ Applying these choice of law principles to the instant case, we conclude that the law of New York should be applied in resolving this contract dispute. Both Spain and New York have substantial contacts with the instant dispute. The preliminary negotiations and initial agreement between the parties occurred in Spain; the defendants Nickel Odeon and its two principals, Alenda and Garci, are citizens of Spain; and the subject matter of the alleged contract is a Spanish-made film. *Cf. Transatlantic Cement v. Lambert Freres Et Cie*, 462 F.Supp. 363, 365 (S.D.N.Y.1978) (applying French law in contract dispute where defendants were French citizens, preliminary negotiations occurred in France, and alleged agreement occurred in France). A number of other significant factors, however, counterbalance or otherwise undermine the strength or substantiality of those contacts. Plaintiff is a resident of New York whose place of business is also located in that state. Final agreement on the duration of the alleged contract occurred in France, rather than Spain, as contemplated by the parties when the original "agreement" was entered into. Dep. Stillman 76–77. *Cf. Teledyne Industries, Inc. v. Eon Corp.*, 373 F.Supp. 191, 200 (S.D.N.Y.1974) (applying California law where contract negotiated entirely in California, was signed there, and involved California plaintiff and New York defendant with division in California). A substantial part of the contract's performance was to originate from plaintiff's place of business in New York. In the year following the alleged oral agreement in May 1982, plaintiff engaged in worldwide promotion and distribution efforts which emanated from his New York office. One of the two licensing agreements consummated by plaintiff was entered into in New York; payment under each of these agreements was to be made to plaintiff's office or bank account in New York. Although plaintiff's performance of his contract duties also involved extensive travel all over the world, the agreement

specifically excluded Spain from the scope of plaintiff's exclusive worldwide representation authority. Thus, while Spain has substantial contacts with respect to the execution of the alleged agreement, New York also has significant contacts with the contract as a whole. *Cf. Transatlantic Cement, supra,* 462 F.Supp. at 365 (applying French law where only event occurring in New York was meeting between parties which led to cessation of contractual relationship).

The relative interests of each forum in having its law apply to resolve this dispute favor the application of New York law. Although Spain has both a statute of frauds-type provision and a registration requirement for film distributors, Spain's lack of interest arises primarily from the inapplicability of these provisions to the instant dispute.

As for the statute of frauds provision, a forum's interest in having such a statute apply is two-fold: first, to protect its courts from perjury and use as instruments of extortion, and second, to protect the enacting forum's defendants from lawsuits for alleged promises informally made. *Daystrom,* 300 N.Y.S.2d at 828, 248 N.E.2d at 583. Here, the first interest is inapplicable since this lawsuit is being brought in New York federal court and thus does not threaten the integrity of Spanish courts. *See Kristinus v. H. Stern & Com. E Ind. S.A.,* 463 F.Supp. 1263, 1265 (S.D.N.Y. 1979). The second interest, to the extent it is implicated by plaintiff's claim of an alleged oral contract for worldwide (except Spain) film representation rights, will be preserved by applying New York law as fully as it would be by applying Spanish law. Under the Spanish Commercial Code, whose provisions apply to the instant case,[5]

Commercial contracts shall be valid, binding and enforceable regardless of the form or language in which they are entered into, their type or the amount involved, provided that their existence is proven by one of the means established under Civil law. However, the testimony of witnesses of itself shall not be sufficient to prove the existence of a contract involving more than 1,500 pesetas, unless it is in conjunction with some other proof.

Comm.Code Art. 51. In the instant case, plaintiff does not rely merely on witnesses' testimony to establish the existence of the alleged contract with Nickel Odeon. Instead, plaintiff has produced substantial documentary evidence of worldwide film promotion and sales efforts consistent with the terms of the alleged agreement, as well as a written confirmation, signed by both parties, which ratifies the existence of at least some form of agency relationship between plaintiff and defendants in terms substantially similar to those testified to by plaintiff and embodied in an unsigned representation agreement purporting to "formalize[ ] the verbal agreement" between the parties. Thus, the issue under New York or Spanish law is essentially the same: whether the testimonial and documentary evidence described above is sufficient as a factual matter to establish the existence of an agreement between the parties as plaintiff alleges. Although we do not decide at this stage of the litigation whether such an agreement in fact existed, we nevertheless are persuaded that the evidence submitted by the parties with respect to the choice of law question is sufficient to undermine any interest which Spain might otherwise have in having its Commercial Code provisions apply in resolving this dispute.

---

**5.** The Spanish Civil Code requires that contracts under which the services of either party exceeds 1,500 pesetas (approximately $9) must be in writing. Civil Code Art. 1280. The Commercial Code's own specific provisions, however, take precedence in cases involving commercial contracts. Comm.Code Art. 50 ("Commercial contracts ... shall follow, in all matters not ex-

pressly set forth in this code or in special statutes, the general rules of the [Civil Code]"). Both parties agree that the instant contract is a commercial contract. *See* Rachlin Aff.Ex.A, at 10–11 (opinion of plaintiff's Spanish law expert); Seife Aff.Ex.E, at 2–3 (opinion of defendants' Spanish law expert).

Spain's second asserted interest in having its laws apply relates to its regulatory provisions regarding filmmaking activities. Specifically, Section 32 of the Ordinance of 7 April 1978 provides that

There shall be a public registry, called Registry of Film Companies and kept in the General Film Management Office, in which movie companies which produce, distribute or exhibit films, labs, film shooting studios, dubbing studios, export companies and auxiliary companies for films must be entered.

A company not entered in the Registry may not hold any type of license or authorization, and will not be entitled to credits or subsidies in matters pertaining to the competence of the General Film Management Office.

According to Jose Antonio Suarez de la Dehesa, defendants' Spanish law expert, plaintiff's undisputed failure to comply with this provision renders him incompetent, or without capacity, to enter into an agreement to distribute a Spanish film, and any such contract entered into by plaintiff is without legal effect. *See* Seife Aff. Ex.G.

We may assume that Spain has an interest in the application of its laws "which regulate[ ] certain filmmaking activities." *See* Ordinance of 7 April 1978 (Ministry of Culture) Section 16 (annexed as Ex. 1 to Rachlin Aff.Ex.A). We have difficulty, however, with the contention that this interest will be legitimately advanced in the instant case. First, this provision does not necessarily displace or augment the general provisions of Spain's Commercial Code governing commercial contracts. As noted previously, commercial contracts are governed by the Civil Code except for matters expressly set forth in the Commercial Code or in special statutes. The Civil Code provisions require three elements in order to establish a valid contract: consent of the contracting parties (which may not be given by unemancipated minors, or by insane, demented, deaf-mute persons or persons unable to write), a specific subject matter, and consideration. Civil Code §§ 1621, 1623. Plaintiff's alleged oral agreement

with Nickel Odeon has undoubtedly satisfied each of these elements. While the Commercial Code makes allowance for "special statutes" which may supersede or augment its general provisions, it does not evince any similar intent with respect to a Ministerial Order, which under Spanish law is merely a regulatory-type interpretation of a Royal Decree and thus is neither a statute nor an interpretation of a statute. Rachlin Aff.Ex.A. at 5–6. It is thus doubtful that this ordinance can be reasonably and properly construed as a limitation on plaintiff's contractual authority. *See* Rachlin Aff.Ex.A.

Second, even assuming that this ordinance can be construed in the manner defendants suggest, *i.e.*, as a further limitation on contractual authority with respect to filmmaking activities, it is doubtful that this ordinance was designed to apply to contracts which specifically exclude Spain from the scope of authorized performance. While defendants' Spanish law expert opined that failure to comply with the ordinance affects a party's contractual capacity and that film distributors from all over the world are permitted to register with Spain's General Film Management Office, these conclusions are not inconsistent with an interpretation of the ordinance which would deprive non-registered persons from Spain or elsewhere of legal authority to agree to perform film distribution work in Spain. We have considerable difficulty, however, with an interpretation which would give this non-statutory ordinance worldwide applicability, particularly in a case where the parties specifically excluded Spain from the scope of their agreement. While Spain, like any state, has a legitimate interest in ensuring conformity with its regulations governing the transaction of business within its borders, this interest surely wanes in situations where the scope of contractual duties is specifically designed to exclude that forum from the parties' agreement.

Finally, the interpretation suggested by defendants, if accepted, would presumably undermine the enforceability of the parties'

February 1983 agreement as well. In that agreement, defendants confirmed that plaintiff had been "performing under the authorization of Nickelodeon" in negotiating the sale of its film in Australia and Israel. The ordinance in question, however, provides that non-registered companies "may not hold any type of license or authorization" with respect to various film-making matters. Curiously, neither the defendants nor their Spanish law expert have suggested that this ordinance applies in the manner suggested above, suggesting not only that the ordinance's limits on contractual authority are applicable, if at all, to filmmaking activity in Spain only, but also that the parties themselves did not contemplate that Spanish law in general or this ordinance in particular would apply to their various alleged legal relationships. *Cf. Teledyne Industries, supra,* 373 F.Supp. at 200 (fact that particular state's law was within contemplation of parties is important consideration in determining which law to apply). Instead, the parties' exclusion of Spain from their alleged oral agreement and their subsequent confirmation of plaintiff's legal authority to negotiate the sale of defendants' film in at least two other countries are both important reasons for declining to apply the aforementioned ordinance in the manner defendants suggest. Accordingly, there is little in the way of foreign state interests to be advanced by applying Spanish law in resolving the instant case.

In contrast to Spain's limited interest in having its laws applied in this case, New York has a legitimate and substantial interest in the application of its laws. New York has an interest in insuring that persons who enter into agreements with its citizens which involve the performance of contract obligations within the state abide by their obligations. It also has an interest in permitting resolution of a dispute such as this on the merits, especially where the applicability of a foreign state's laws was not reasonably contemplated by the parties and would permit the foreign defendants to avoid asserted contractual obligations which might otherwise be established and

enforceable under New York law. *Cf. Kristinus, supra,* 463 F.Supp. at 1268. In *Kristinus,* a Pennsylvania resident sued a Brazilian jeweler for breach of an alleged promise to refund, at the jeweler's New York franchise office, the price of jewels which plaintiff had purchased from the jeweler in Brazil. The court held that New York law (which the court assumed would allow plaintiff to enforce the promise), rather than Brazilian law (which required written evidence of such an agreement), would be applied under New York choice of law rules. According to the court, the fact that the contract was to be performed in New York rendered New York's interests paramount to Brazil's interest in protecting its citizens from unfounded contractual claims and thus would lead a New York court "to decline to apply foreign law where, as here, that law would foreclose enforcement of a contract valid under New York law." *Id.* at 1265. In the instant case, New York also has an interest in protecting the rights of its own citizens whose performance of contractual duties is to occur substantially within its borders. While the defendants in the instant case did not thrust themselves into the New York marketplace as did the Brazilian jeweler in *Kristinus,* the parties with active contractual duties of performance in both cases were to perform these duties primarily in New York. And unlike *Kristinus,* the parties in this case specifically excluded the foreign forum from the realm of plaintiff's contractual rights and defendants' contractual duties. This is not a case of a party seeking to avoid the effect of its own forum's law and benefit from a foreign jurisdiction's lack of similar legal protection under circumstances which do not advance the interests of either forum. *See Daystrom, supra.* Rather, plaintiff seeks the protection of his own state's law where the application of this law is consistent with the parties' reasonable expectations, will advance his state's legal interests, and will not undermine the legitimate interests underlying the foreign state's laws.

Based on the above considerations, we conclude that a New York court would apply New York law in resolving the instant contract dispute. Accordingly, Nickel Odeon's motion for summary judgment with respect to plaintiff's claims of breach of the alleged oral agreement (claims 1 and 2) is denied. Insofar as the motion of defendants Nickel Odeon, Garci and Alenda for summary judgment with respect to the February 1983 agreement between the parties (claims 4 and 5) is predicated on the application and interpretation of Spanish law, the motion is denied. Insofar as defendants Nickel Odeon, Garci, Alenda, and S/R/L's motion for summary judgment with respect to some of plaintiff's claims of tortious interference with his contracts (claims 6–8 and 13–19) is based on the assumed invalidity of these contracts under Spanish law, *see* Defendant's Memorandum of Law, at 7, 14–15, the motion is denied.

Finally, defendant S/R/L's motion for summary judgment with respect to plaintiff's tortious interference claim is denied. Defendant claims that the only evidence which plaintiff has produced in support of this claim is hearsay and that such evidence is insufficient to defeat a motion for summary judgment. The evidence produced by plaintiff in support of his claim is summarized in the affidavit of Howard W. Rachlin, Esq., plaintiff's counsel, and includes various exhibits, responses to interrogatories, and deposition testimony of plaintiff, plaintiff's former counsel, and S/R/L's president. Without opining as to the persuasiveness of each of these sources of evidence, perusal of these materials nevertheless reveals that plaintiff does not rely simply on hearsay affidavits in opposing defendant's summary judgment motion. *Cf. Schwimmer v. Sony Corp. of America*, 637 F.2d 41, 45 n. 9 (2d Cir.1980). The factual issues raised by plaintiff's submissions cannot properly be resolved at this stage of the litigation. Defendant's motion for summary judgment on this basis is therefore denied.

The parties are directed to appear before this Court for a pre-trial conference on Wednesday, May 29, 1985 at 9:30 A.M.

SO ORDERED.