**TELEDYNE INDUSTRIES, INC.,**
Plaintiff,

v.

**EON CORPORATION et al.,**
Defendants.

No. 72 Civ. 3261.

United States District Court,
S. D. New York.

July 29, 1975.

Breed, Abbott & Morgan, New York City, for plaintiff; by Stephen R. Lang, Charles M. Mitchell, George F. Vary, New York City, of counsel.

Feldshuh & Frank, New York City, for defendants; by Sidney Feldshuh, Richard Weinberger, Alexander T. West, Jr., New York City, of counsel.

WHITMAN KNAPP, District Judge.

This complicated diversity action was tried without a jury over a twelve-day period in part during July, 1974, and in part during January, 1975. The plaintiff, Teledyne Industries, Inc. (Teledyne), is a California corporation with its principal place of business in Los Angeles. It is seeking to impose liabili-

ty on four individual defendants who are all directors and/or officers of Eon Corporation, a New York corporation with its principal place of business in Brooklyn. The reason behind this attempt to impose personal liability upon these defendants is that the corporation has become bankrupt.

The factual background to this action is fully set forth in District Judge Bauman's opinion denying the defendants' motion for summary judgment. *Teledyne Industries, Inc. v. Eon Corporation* (S.D.N.Y.1974) 373 F.Supp. 191. For reasons of clarity, however, as well as to comply with the mandate of Rule 52(a) of the Federal Rules of Civil Procedure, it seems necessary again to set forth the general factual framework underlying this dispute.

The Eon Corporation, founded in 1961, is engaged in the research, development and marketing of medical, nuclear, electronic and optical devices. In December, 1968, the company acquired what was called the American Marc Division, located in Inglewood, California. The division was engaged in the manufacture of diesel engines and electric generators. The head of the American Marc Division, and a significant participant in the dispute involved here, was M. James Leonard, who was also a vice president and director of Eon. Of the four defendants, Anton is president of Eon, Podell chairman of the board, Waller secretary, and Srybnik, both individually and through corporations under his control, the largest single shareholder. All are, and at the time of the events in question were, directors of Eon.

On June 20, 1969, Eon, through its American Marc Division was awarded a contract by the United States Army, No. DAA K01–69–C–A359, for the manufacture, production and delivery of 1.5 KW generator sets. The American Marc Division, however, had been unprofitable and the contract was insufficient to save it. Shortly after the contract's award,

Eon's board of directors decided to terminate manufacturing operations at the plant. Pursuant to this decision, Eon began to look for a subcontractor to fulfill its remaining commitments under the Army contract. Eon's interest in locating such a subcontractor was communicated by Leonard to one Eugene Wolper who, in turn, contacted Harold Rouse, a Teledyne vice president sometime in early May. Since Teledyne had submitted an unsuccessful bid to the government in March, 1971 to manufacture the same type of generator being manufactured by American Marc, it was not extraordinary that Rouse expressed interest in the deal. A meeting was arranged in Los Angeles between Teledyne and Eon representatives for May 10, 1971.

The negotiations proceeded rapidly, and culminated three days later on May 12, with the signing of two contracts. Present during all or part of the negotiations was Leonard, Wolper, Rouse, and Homer Coleman, another Teledyne executive. Anton arrived in Los Angeles on May 12, and participated in the final discussions and execution of the agreements. The extent of Anton's participation in, and knowledge of, the negotiations is a critical issue in this lawsuit.

Two documents were executed by the parties on May 12. One was Purchase Order No. M–1257, the subcontract arrangement whereon Teledyne agreed to manufacture 4,372 generator sets at a unit price of $360, or a total contract cost of $1,573,920, and to deliver them according to the provisions in the original Army contract.[1] The other was an inventory agreement which provided, in part, that Teledyne would purchase from Eon all of the generator set parts and material in Eon's possession as of August 31, 1971 which was in "reasonably good condition". Teledyne agreed to pay a price equal to 75 percent of the value of the inventory. In addition, Te-

---

1. The Army had agreed under the original contract to pay Eon a unit price of $392. Thus, Eon stood to earn $32 per unit by subcontracting to Teledyne.

ledyne purchased tooling, gauges and other equipment needed to perform the subcontract from Eon for a price of $25,000.

As part of the contractual agreement, the parties also made certain arrangements for payment from Eon to Teledyne. A letter from Rouse to Leonard dated May 13, 1971, acknowledged and accepted by Leonard on May 25, 1971, speaks of the understanding in general terms:

"Eon will arrange with Bank of America to hold funds received from 1.5 KW generator sales, covered on EON Purchase Order No. M–1257 in a special account, which will be used to pay TCM invoices. Mr. Leonard to confirm this, in writing, to exact arrangements, etc."

The arrangements were spelled out in a letter dated May 25, 1975 from Leonard to the Palos Verdes branch of the Bank of America. The letter which is set out in full below,[2] provided that all funds received by American Marc from the sale of the generators would be held on deposit in a "special account." When the funds were received, the Bank would be directed to use those funds to pay the amounts of Teledyne's invoices. The remainder in the account was to "be dispursed according to the direction of American Marc Division of EON Corporation." A copy of this letter was sent to both Rouse and Coleman, the latter to whom Leonard wrote on May 25, 1971:

". . . [I have] arranged for the Bank of America to hold funds received from [the] generator sales in a

2. "May 25, 1971
 Bank of America
 Golden Cove—Palos Verdes Branch
 31176 Hawthorne Boulevard
 Palos Verdes Peninsula, California 90274

 Attention: Mrs. Fern Guy

Dear Mrs. Guy:
 American Marc Division of EON Corporation has issued P.O. No. M–1257 to Teledyne Continental Motors, 1000 Ryan Avenue, Walterboro, South Carolina to produce approximately 4000 generator sets.
 Accordingly we have agreed to have all funds received by American Marc from the sale of these generator sets to the U. S. Government held in our special account which we have opened at the Bank of America for this purpose.
 Teledyne Continental Motors' invoices will be sent to American Marc for generator sets as they are produced and shipped by TCM. American Marc will immediately invoice the U. S. Government for the units shipped.
 American Marc will notify the Bank of America and TCM the exact invoices and amounts that have been included in the American Marc request for payment from the U. S. Government.
 When the funds are received, the check will be deposited in the special account and the Bank will be directed to use the funds to pay the amounts of the invoices which were included in the payment check, directly to TCM by cashiers check. The balance in the account will be dispursed according to the direction of American Marc Division of EON Corporation.
 We appreciate your courtesy extended to American Marc and TCM in this regard.

 Sincerely,
 AMERICAN MARC DIVISION
 EON CORPORATION
 /s/ M. J. LEONARD
 M. J. Leonard
 Vice President-General Manager

 MJL:ir"

special account which will be used to pay TCM [Teledyne] invoices. (See letter attached)"

Teledyne commenced production and delivery of the generator sets in late 1971, and for a while the arrangement worked as planned. In the Spring of 1972, however, Eon ceased making its payments under the subcontract. The money received from the government from the sale of the generators was not paid to Teledyne but was used for other corporate purposes. On July 29, 1972 Teledyne commenced this action.

At trial, Teledyne sought to prove two separate theories of liability. First, it alleged that the four defendants had embarked upon a scheme to defraud Teledyne by inducing it to enter into a contract which they knew Eon lacked the means to perform. Specifically, it charged that two fraudulent representations were made to Teledyne: (a) that the amount remaining to be paid to Eon from the government under the original contract was greater than the subcontract price; and (b) that Eon had clear and unencumbered title to the inventory, tooling and other equipment which Teledyne agreed to purchase. Secondly, Teledyne argued that the four defendants participated with Eon in breaching a fiduciary duty, allegedly owed by Eon to Teledyne. Plaintiff's claim in this connection was that the Bank of America special account had been established as part of the contract, that its purpose had been to insure the payment of Teledyne invoices, and that Eon had consented not to withdraw any funds from this account until Teledyne had been paid in full. It would follow, according to plaintiff's contention, that the subsequent diversion of these funds by the four defendants for other corporate purposes constituted a breach of trust and an act of conversion.

The defendants, of course, vigorously contest these allegations. They maintain that no fraudulent misrepresentations were made in the negotiation of the Eon-Teledyne contract, and that the parties never intended to create any sort of fiduciary or trust relationship. Although the defendants acknowledge, as they must, that Eon did breach its contract with Teledyne, they deny personally engaging in any sort of conduct that would lead to the imposition of individual liability upon them for the breaches or torts of Eon.

## I. Jurisdiction

As a preliminary matter, the defendants maintain that this court lacks jurisdiction to resolve the dispute between the parties. The defendants argue that the exclusive jurisdiction to determine the factual issues here involved exists solely with the bankruptcy court in the Eastern District of New York, the place where Eon has filed a petition for arrangement pursuant to Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 *et seq.* This argument is, however, completely without merit.

The plaintiff commenced this action in July, 1972 against the four individual defendants, Eon Corporation, and another corporation, not here relevant, which was subsequently discontinued as a party. In January, 1973, Eon filed a petition for arrangement in the Bankruptcy Court. On January 12, 1973 Bankruptcy Judge Price in the Eastern District signed an order staying all proceedings against Eon. Since that date, therefore, this action has involved only the plaintiff and the four individual defendants.

On March 13, 1974, Teledyne filed a proof of claim against Eon in the bankruptcy proceeding for the sum of $713,572.65. The proof of claim, which explicitly revealed Teledyne's intention to pursue the instant action here, indicated that the claimed indebtedness was for "goods, wares and merchandise sold and delivered to the Debtor [Eon] at the special instance and request of the Debtor." Subsequently, Teledyne was listed as an unsecured creditor of Eon and took part in the arrangement. Judge

Price confirmed the amended plan of arrangement in an order dated April 30, 1975.[3]

Based on the foregoing undisputed chronology, the defendants contend that this court is foreclosed from resolving the issues involved in this litigation. They rely on the exclusive jurisdiction of the bankruptcy court over Eon, and, in the alternative, on the doctrines of res judicata or collateral estoppel. Both contentions must be rejected.

█ █ First of all, under the bankruptcy statute, the exclusive jurisdiction of the bankruptcy court extends only to the debtor, in this case Eon, and *its* property. 11 U.S.C. § 711.[4] In this action, the plaintiff is seeking to impose liability on the individual defendants personally. The subject matter of this lawsuit is clearly not property in the actual or constructive possession of Eon. A judgment in favor of plaintiff will in no way affect Eon or its property, and obviously will not interfere with the bankruptcy court's order of arrangement.

█ Secondly, the stay issued by the bankruptcy judge with respect to Eon does not in the least affect these proceedings. The power to enjoin lawsuits pursuant to 11 U.S.C. § 714[5] is confined to actions in which the debtor is a party or in which the debtor's property is directly affected. *Evarts v. Eloy Gin Corp.* (9th Cir. 1953) 204 F.2d 712, *cert. denied* 346 U.S. 876, 74 S.Ct. 129, 98 L. Ed. 384; 8 Collier on Bankruptcy, § 3.21 (14th Ed. 1971). As noted above, the instant action involves neither the debtor nor its property. Indeed, the bankruptcy judge himself in this case specifically refused to enjoin Teledyne's suit against the individual defendants.

█ The defendants' claim of res judicata or collateral estoppel must likewise be rejected. They argue that since Teledyne filed a proof of claim and proceeded as an unsecured general creditor in the bankruptcy proceeding, it should be estopped from now proving that the transaction between Teledyne and Eon was fraudulent or that a fiduciary relationship between the corporations existed. The defendants lay great stress on the fact that Teledyne did not seek to have Eon's debt declared non-dischargeable pursuant to 11 U.S.C. § 35(a),[6] a

---

3. The final order of confirmation, dated April 30, 1975, was submitted to the Court by the defendants' attorney in the first week of July. During the trial, the Court had given the defendants permission to supplement the record by submitting any papers from the bankruptcy proceeding that they wished the Court to consider. Any such documents received will be placed in a folder and marked as Court's exhibit AAA.

4. 11 U.S.C. § 711:
 § 711. Exclusive jurisdiction of debtor and property
 Where not inconsistent with the provisions of this chapter, the court in which the petition is filed shall, for the purposes of this chapter, have exclusive jurisdiction of the debtor and his property, wherever located.

5. 11 U.S.C. § 714:
 § 714. Stay of actions
 The court may, in addition to the relief provided by section 29 of this title and elsewhere under this chapter, enjoin or stay until final decree the commencement or continuation of suits other than suits to enforce liens upon the property of a debtor, and

may, upon notice and for cause shown, enjoin or stay until final decree any act or the commencement or continuation of any proceeding to enforce any lien upon the property of a debtor.

6. 11 U.S.C. § 35(a):
 § 35. Dischargeability of debts—Debts not affected by discharge
 (a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as (1) are taxes which became legally due and owing by the bankrupt to the United States or to any State or any subdivision thereof within three years preceding bankruptcy: Provided, however, That a discharge in bankruptcy shall not release a bankrupt from any taxes (a) which were not assessed in any case in which the bankrupt failed to make a return required by law, (b) which were assessed within one year preceding bankruptcy in any case in which the bankrupt failed to make a return required by law, (c) which were not reported on a return made by the bankrupt and which were not assessed prior to bankruptcy by reason

provision which releases a bankrupt from all of his provable debts except for eight specified categories of liabilities, one of which is a liability "for obtaining money or property by false pretenses or false representations, . . . or for willful and malicious conversion of the property of another." 11 U.S.C. § 35(a)(2). The defendants further rely on Bankruptcy Judge Price's order confirming the plan of arrangement for Eon Corporation which reads in part as follows:

". . . and it appearing to the satisfaction of this Court that the provisions of said Chapter XI have been complied with and the said Amended Plan of Arrangement is for the best interests of all creditors and is feasible and *that the said debtor has not been guilty of any of the acts or failed to perform any of the duties which would be a bar to the discharge of a bankrupt*, and that said proposal and its acceptance are in good faith . . ." (emphasis added).

■ The defendants' argument is, however, specious. As is now well-established, under the doctrine of res judi-

cata, a final judgment rendered on the merits in a prior action involving the same parties or their privies bars a second suit based on the same cause of action. *Lawlor v. National Screen Service* (1955) 349 U.S. 322, 75 S.Ct. 865, 99 L. Ed. 1122, *United States v. General Electric Company* (S.D.N.Y.1973) 358 F. Supp. 731. In order for the doctrine to apply all of its elements must be satisfied.

In this case, it seems clear that the doctrine is inapplicable. First of all, in the bankruptcy proceeding the parties bound by Judge Price's order were Teledyne and Eon. The confirmation order only affects Eon's debts to Teledyne. It obviously can have no effect on any debts owed to Teledyne by the individual defendants. Secondly, in this lawsuit we are dealing with causes of action totally different than those which were at issue before the bankruptcy court. The function of a Chapter XI proceeding is to provide for an arrangement for the settlement, satisfaction, or extension of time of payment of the unsecured debts of a bankrupt. 11 U.S.C. § 701 *et seq.* In that proceeding, Teledyne sought only to satisfy Eon's contractual obligation to

of a prohibition on assessment pending the exhaustion of administrative or judicial remedies available to the bankrupt, (d) with respect to which the bankrupt made a false or fraudulent return, or willfully attempted in any manner to evade or defeat, or (e) which the bankrupt has collected or withheld from others as required by the laws of the United States or any State or political subdivision thereof, but has not paid over; but a discharge shall not be a bar to any remedies available under applicable law to the United States or to any State or any subdivision thereof, against the exemption of the bankrupt allowed by law and duly set apart to him under this title: And provided further, That a discharge in bankruptcy shall not release or affect any tax lien; (2) are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published or caused to made or published in any manner whatsoever with intent to de-

ceive, or for willful and malicious conversion of the property of another; (3) have not been duly scheduled in time for proof and allowance, with the name of the creditor if known to the bankrupt, unless such creditor had notice or actual knowledge of the proceedings in bankruptcy; (4) were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity; (5) are for wages and commissions to the extent they are entitled to priority under subdivision (a) of section 104 of this title; (6) are due for moneys of an employee received or retained by his employer to secure the faithful performance by such employee of the terms of a contract of employment; (7) are for alimony due or to become due, or for maintenance or support of wife or child, or for seduction of an unmarried female or for breach of promise of marriage accompanied by seduction, or for criminal conversation; or (8) are liabilities for willful and malicious injuries to the person or property of another other than conversion as excepted under clause (2) of this subdivision.

it, the basis of the debt being Teledyne's invoices for "goods, wares and merchandise sold and delivered" to Eon. No issue of fraud, conversion or breach of trust was ever raised or litigated in that proceeding.

■ Furthermore, it is equally apparent that the doctrine of collateral estoppel has no bearing on the instant case. Under that doctrine, a prior judgment on the merits precludes relitigation of issues actually litigated and determined in the prior suit, regardless of whether it was based on the same cause of action as the second suit. *Lawlor v. National Screen Service, supra,* 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122. As noted above, the issues of fraud, conversion or breach of trust were not even raised in the bankruptcy proceeding.

## II. Choice of Law

Before turning to the merits of the case, a word about the applicable law is in order. *Klaxon Co. v. Stentor Electric Manufacturing Co.* (1941) 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 requires that federal courts sitting on diversity of citizenship cases follow the conflict of laws rules prevailing in the states in which they are situated. In New York, the courts have adopted "the grouping of contacts" approach to resolving choice of law problems in contract cases. In the landmark case of *Auten v. Auten* (1954) 308 N.Y. 155, 124 N.E.2d 99, the New York Court of Appeals explained that under this approach,

> "the courts, instead of regarding as conclusive the parties' intention or the place of making or performance, lay emphasis rather upon the law of the place 'which has the most significant contacts with the matter in dispute.'"

The merit of this approach is that it gives the forum having the most interest in the problem paramount control over the legal issues arising out of a particular factual context. *Auten v. Auten, supra,* 308 N.Y. 155, 161, 124 N.E. 2d 99.

■ It would appear in this case that the state having the most significant contacts with the relationship at issue here is California. The contracts were negotiated entirely in California and executed there. Teledyne is a California corporation and, while Eon is a New York corporation, its American Marc Division is located in California and had its headquarters in Inglewood. Furthermore, it appears that the parties themselves intended that California law apply. Of the two documents executed on May 12, 1971—the purchase order agreement and the inventory agreement— the latter contains the following clause:

> "8. This contract is entered into in accordance with the law of the State of California and such law shall govern this contract."

Although the purchase order agreement is silent on the question of choice of law, it would not be unwarranted to assume, based on the above clause, that the parties intended California law to apply to their entire relationship.

## III. Merits

### A. Fraud

■■ It is well settled in California, as in most other jurisdictions, that individual corporate directors and officers do not incur personal liability for the torts of their corporation "unless they participate in the wrong or authorize or direct that it be done." *United States Liability Insurance Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 463 P. 2d 770, 83 Cal.Rptr. 418, 463 P.2d 770. See, also *Aeroglide Corporation v. Zeh* (2d Cir. 1962) 301 F.2d 420, *cert. denied* 371 U.S. 822, 83 S.Ct. 38, 9 L.Ed.2d 61; *Armour and Company v. Celic* (2d Cir. 1961) 294 F.2d 432; 3 Fletcher, *Private Corporations* § 1137 (rev.perm.ed.1965). Thus, an officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented. *Penziner v. West American Finance Co.* (1st Dist.Ct.App.1932) 14 P.

2d 810, subseq. opin. 133 Cal.App. 578, 24 P.2d 501. In addition, a corporate officer or director will not be held responsible for the acts of lawfully appointed subagents. *Central Mutual Insurance Company v. Schmidt* (1st Dist. Ct.App.1957) 152 Cal.App.2d 671, 313 P. 2d 132; California Civil Code Annotated § 2351. While the corporation itself may be liable for such acts, the individual officer or director will be immune unless he authorizes, directs, or in some meaningful sense actively participates in the wrongful conduct.

 In this case, the wrongful conduct alleged is that of fraud. In its broad, general sense, the concept of fraud embraces anything that is intended to deceive which results in injury to one who justifiably relies thereon. The elements of actionable fraud consist of (1) misrepresentation (false representation, concealment, or nondisclosure) of a material fact; (2) knowledge of the falsity of the representation; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage. See *Pearson v. Norton* (4th Dist.Ct.App. 1964) 230 Cal.App.2d 1, 40 Cal.Rptr.

634; *Zinn v. Ex-Cello Corp.* (1st Dist. Ct.App.1957) 148 Cal.App.2d 56, 306 P. 2d 1017. All of these elements must be present before fraud can be found and the plaintiff bears the burden of proving each and every element by a fair preponderance of the evidence.[7] *Sierra National Bank v. Brown* (1st Dist.Ct. App.1971) 18 Cal.App.3d 98, 95 Cal. Rptr. 742. See, also *Babcock v. Omansky* (2d Dist.Ct.App.1973) 31 Cal.App.3d 625, 107 Cal.Rptr. 512.

 There can be little doubt in this case that the plaintiff has succeeded in showing that fraud did in fact occur. The testimony of Rouse and Coleman— whom the court found to be truthful and credible witnesses—amply demonstrate that Leonard, while negotiating on behalf of Eon on May 10–12 made representations both with respect to the amount of funds remaining under the Army contract, and with respect to the inventory and tooling that were either intentionally false or misleading.[7a]

The evidence indicates that both Rouse and Coleman were acutely aware of Eon's precarious financial condition,

---

7. In *McDonnell v. American Leduc Petroleums* (1972) 456 F.2d 1170, the Second Circuit, citing a 1968 California District Court of Appeals case, stated that under California law, "fraud must be proved by 'clear and convincing evidence.'" 456 F.2d at 1176. The court however, qualified that statement in a footnote, indicating that since the parties had not raised the issue of whether there is a conflict between New York and California law as to fraudulent misrepresentation, it would not inquire further into the problem. In this case, the choice of law issue was squarely presented, and we are convinced by the *Sierra National Bank* case and the California Supreme Court cases cited therein, that fraud in California need only be proved by a fair preponderance of the evidence.

7a. We should emphasize that, in the absence of a finding of specific misrepresentations, the Court would find that no fraud had been committed by any of the defendants. The plaintiff has argued that all four directors knew or should have known at the time the contract was signed or, in the alternative, at the time Teledyne began to perform

under the contract, that Eon Corporation could not meet its obligations under the contract in question.

After carefully considering the evidence on this point we find that plaintiff has not sustained its burden with respect to this issue. Even assuming that the directors knew that the value of the subcontract was greater than the value of the funds remaining under the main contract, it is certainly possible that they in good faith believed that other sources of income would be generated from Eon's other divisions as time went on. Furthermore, from the point of view of Eon's directors, there were several reasons why they might assume that Teledyne would accept an agreement with a high risk of nonpayment. First, Teledyne had itself bid for the same type of generator contract, and had been rejected. The subcontract would thus be a way for Teledyne to commence a relationship with the government that might prove financially beneficial in the future. Secondly, Teledyne's Walterboro plant was not being used to optimum capacity which might conceivably make it advisable to take work having a high risk of loss.

and realized that Eon would have no means to pay Teledyne pursuant to the proposed subcontract but for the monies remaining to be paid to Eon from the Army under the main contract. The Teledyne representatives therefore sought assurances from Leonard that the monies due Eon under the main contract would exceed the amount Eon would owe Teledyne under the subcontract. As Rouse and Coleman both testified, Leonard gave such assurances, despite the fact that he knew Eon had already been paid for work yet to be done through the receipt of "progress payments" from the government.[8] As a result of these advance payments, the funds remaining available to Eon under the Army contract were approximately $400,000 less than the value of the subcontract as of May, 1971. Furthermore, this evidence clearly indicates that this information could have been obtained quite easily and speedily from documents that were in Eon's possession at the time.[9]

Leonard's other misrepresentation was more of a material omission rather than a false statement. As both Rouse and Coleman testified, and Rouse's "Daytimer"[10] corroborates, the Teledyne representatives also sought assurances that American Marc owned the inventory and tooling it sought to sell Teledyne. Teledyne had originally wanted to offset the purchase price of the inventory and tooling against payments to be due Teledyne for deliveries under the subcontract. However, when Leonard refused to do this, citing Eon's need for cash, Teledyne, relying on Leonard's representation that American Marc owned the tooling, and, of course, Leonard's representation that sufficient monies existed under the main contract, paid Eon in

cash $196,859.16 for the inventory and an additional $25,000 for the tooling.

What Leonard had failed to tell the Teledyne representatives, although the evidence clearly shows that he knew of this fact, was that Eon had progress-billed on the inventory and tooling, thereby giving the government at least an interest in the equipment, and arguably even title. Eon's 1971 Financial Statement, issued in February, 1971, clearly recognized that the problem of who owned title to the inventory existed when it stated in a footnote to its financial report that:

> "Progress payments for government contract work have been offset against inventory as under the terms of the contract title to certain of the inventory is vested in the government. Offsets for 1971 and 1970 are $597,135 and $117,877 respectively."

Despite the recognition of the problem, however, the inventory agreement itself —drawn up after Leonard's assurance —in no way even hints that Teledyne may be purchasing encumbered property.

The fact that fraudulent misrepresentations were made, however, is of little avail to the plaintiff in this lawsuit, unless it can also show that each of the four individual defendants knew of, directed or authorized, or actively participated in the fraud. After carefully reviewing the evidence and weighing the credibility of the various witnesses, we find that plaintiff has not met his burden on this issue.

Based on the evidence at trial, the four defendants divide into two categories—Waller, Podell and Srybnik, on one hand, and Anton on the other.

---

8. Under the specific provisions of the Army contract, Eon was allowed to obtain from the United States Government 85 percent of its government-allowable costs in advance. These advance payments are commonly referred to as progress payments. The Government would then later pay Eon the remaining balance of fifteen percent of its costs, plus whatever additional monies were due on the selling price of the product shipped, delivered and accepted by the Government.

9. See Plaintiff's Exhibit-19 and Tr. 934–939, as well as the testimony of Busillo.

10. "Daytimer" was Rouse's word for a small diary he habitually carried with him.

As to the first three defendants, all New York directors, there is really no evidence beyond mere conjecture that they knew or participated in the fraud. None of these directors and officers took part in the Teledyne-Eon negotiations. None of them came to California during the critical three days in May. And there is no evidence whatsoever that they spoke to Leonard, their authorized representative, by phone during that period. Plaintiff relies heavily on the fact that the subcontract arrangement was a matter of major importance to the Eon board, was frequently discussed among them, and that each obviously had a financial interest in completing the negotiations at any cost. However, more evidence than this would be required before a finding of fraud would be appropriate. As the evidence stands now, it would only be an act of unwarranted omniscience on the part of the court summarily to infer that these directors were aware of the misrepresentations that helped induce the contract.

As to Anton, the evidence is far more substantial. Anton as president of Eon, was the chief operating officer of the company. During the May 10–12 negotiations, Leonard spoke to Anton over the phone concerning the discussions. And on May 12, Anton flew to California where he took part in the closing negotiations and executed the final documents. Furthermore, Rouse testified that he reviewed the points in his Daytimer, which included Leonard's two misrepresentations, in Anton's presence on May 12.

However, after considering all this evidence, we still must find that plaintiff has not met its burden of proving Anton's knowledge and participation. Here pertinent are Justice Curtis' words for a unanimous California Supreme Court in *Hedden v. Waldeck* (1937) 9 Cal.2d 631, 72 P.2d 114:

"Actual fraud is never presumed but must affirmatively be established. The evidence must amount to proof of fraud, and where the circumstances of the transfer comport equally with the theory of honesty and fair dealing, fraud will not be found." (quoting from 12 Cal.Jur. P. 1057.)

We take these words not as a qualification of the legal principle that fraud may be proved by a simple preponderance of evidence, but as a recognition of the factual presumption that normal people do not lightly embark upon fraudulent conduct. Bearing that presumption in mind, we do not find that fraud has been brought home to Anton.

First of all, Anton himself vigorously denied any knowledge or participation in the fraud. While his credibility as a witness did leave much to be desired, it is apparent that his active role in the negotiations with Teledyne were minimal. He arrived in California on the afternoon of the last day and took part only in the tail end of the discussions, after the detailed negotiations had been completed. Rouse's Daytimer entries while more than sufficient to establish Leonard's misrepresentations give no clue as to how detailed and comprehensive the discussions were in Anton's presence. It is more likely than not, based on the time involved that these discussions were not very extensive, and that Rouse used the occasion primarily to highlight the points of agreement.

Although we have found Rouse to be a wholly credible witness, this does not gainsay the fact that he was interested in the outcome and would therefore tend to remember things important to his view of the case. With that background, the sparseness of his recollection of actual conversations with Anton becomes quite significant. We are therefore not convinced that Leonard's misrepresentations were made known to Anton.

Finally, on this point, we do not think we can assume that Leonard himself informed Anton about the misrepresentations. Leonard, it is clear from the evidence was motivated by desires other than the best interests of Eon. He had

been promised a cash bonus by the directors of Eon if he successfully subcontracted the Army contract and wound up American Marc's operations quickly. He might well have concluded not to jeopardize that bonus by telling Anton of any fraudulent misrepresentations that he had made. Furthermore, other evidence suggests that Leonard failed to disclose to the board of directors other aspects of the negotiations, particularly the arrangement whereby Wolper was paid a sales commission for his role in arranging the negotiations between Teledyne and Eon.[11]

### B. *Breach of Trust and Conversion*

 It is well established in California that conversion "is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Gruber v. Pacific States Savings & Loan Co.* (1939) 13 Cal.2d 144, 148, 88 P.2d 137, 139; *Zaslow v. Kroenert* (1946) 29 Cal.2d 541, 176 P.2d 1; *Poggi v. Scott* (1914) 167 Cal. 372, 139 P. 815. The plaintiff must establish that he had possession or the right to immediate possession of the property at the time of the alleged conversion. *General Motors Assistance Corp. v. Dallas* (1926) 198 Cal. 365, 245 P. 184. The action may be maintained by a person who, although not in possession, has a special interest in the property giving him a right to possession at the time of the conversion. *Pope v. National Aero Finance Co.* (1st Dist.Ct.App.1965) 236 Cal.App.2d 722, 46 Cal.Rptr. 233; *Carvell v. Weaver* (1st Dist.Ct.App.1921) 54 Cal.App. 734, 202 P. 897.

 As Judge Bauman observed in his opinion in this case, 373 F.Supp. at 202, whether or not Teledyne possesses a special interest depends on the proper interpretation of the documents creating the special account. The plaintiff contends that Eon agreed to deposit all government payments in this account, and agreed that no monies would be withdrawn until Teledyne's invoices were paid in full. The defendants, on the other hand, acknowledge the existence of the special account, but maintain that it was never the intention to give priority to Teledyne's invoices or restrict the use of the account in any way. If the plaintiff is successful on this issue it seems clear that this would demonstrate the requisite special interest sufficient to maintain an action for conversion. Similarly, if the testimony and documents are given the interpretation which plaintiff urges, it would also establish the existence of a fiduciary relationship. See, *Teledyne v. Eon Corporation, supra,* 373 F.Supp. 201; *Twomey v. Mitchum, Jones & Templeton, Inc.* (1st Dist.Ct. App.1968) 262 Cal.App.2d 690, 69 Cal. Rptr. 222; *Downey v. Humphreys* (2d Dist.Ct.App.1951) 102 Cal.App.2d 323, 227 P.2d 484.

There can be little doubt after considering the testimony adduced at trial that the evidence convincingly supports plaintiff's version of the intended purpose of the special account arrangement. To put it quite bluntly, no other explanation makes any sense whatsoever.

First, Rouse and Coleman both were concerned over Eon's ability to meet its financial obligations under the proposed subcontract. They both knew that Eon's only source of income were the funds available under the Army contract, which they then thought were sufficient to meet Eon's obligations to Teledyne. The sole purpose in suggesting the special account was to inexorably link the Army's payment to Eon to Eon's payment of Teledyne invoices. It was

---

11. The defendants argue that Teledyne's payment to Wolper was in violation of the purchase order as well as United States Government rules and regulations, and therefore the action should be dismissed. We regard this argument as totally specious and insufficient in law. In any case, Leonard's participation in this arrangement, acting with actual and apparent authority from Eon, would foreclose this argument to the four defendants.

therefore critical that Eon agree to pay Teledyne invoices first out of the funds deposited in this account. If it were otherwise, that is, if defendants' version of the mechanics of the account were accepted, the existence of the special account would not only fail to give Teledyne assurance of being paid, it would not even materially enhance the probability of payment.

The documentary evidence further supports the view that the parties intended that Eon's use of the Army funds on deposit would be restricted first to the payment of Teledyne invoices only, and that any balance remaining would then be freed for other uses. Rouse's handwritten notes, made on the days of his negotiations with Leonard, indicate that Teledyne was to be paid first out of the special account. Leonard's letter to the bank on May 25, 1971 states:

"When the funds are received, the check will be deposited in the special account and the Bank will be directed to use the funds to pay the amounts of the invoices which were included in the payment check, directly to TCM by cashiers. check. The balance in the account will be dispersed according to the direction of American Marc Division of EON Corporation."

Finally, plaintiff's version is supported by a letter from Leonard to Coleman, dated October 11, 1971, wherein Leonard wrote:

"We will pay you as we agreed and you have the largest bank in California acting as a monitor in your behalf . . ."

One may query, as did Judge Bauman, 373 F.Supp. at 200, what conceivable monitoring function could be performed if the account were administered in the manner in which defendants contend.

Having concluded that Eon did undertake to act as a fiduciary on Teledyne's behalf, and that the plaintiff had a special interest in the special account, it is clear that the four defendants must be held liable in damages for both breach of trust and conversion.

There is no dispute that the four defendants authorized and did use the funds in the special account for purposes other than the payment of Teledyne invoices. The evidence clearly establishes that at the time of these conversions if not long before, both Anton and Srybnik, knew of the special account arrangement. It is also more probable than not that Podell and Waller knew of the restriction on the account. In any case, the knowledge and intent of the individuals is irrelevant in an action for conversion. As the California Supreme Court said in *Poggi v. Scott, supra,* 167 Cal. 372, 139 P. 815:

"The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance are of the gist of the action."

*IV. Damages*

In this case, it would appear that plaintiff's damages for either breach of trust or conversion would be the same, that is, "the value of the property at the time of the conversion" California Civil Code § 3336. See also California Civil Code § 3333.

By the terms of the special account arrangement, as we have construed it, Teledyne obtained an interest in the monies received by Eon from the government which represented the exact invoices and amounts that were included in Eon's request for payment from the government. As the evidence demonstrates, there were two Army payments which the directors used for purposes other than the payment of Teledyne invoices. In April, 1972, Anton caused a check to be stopped which Leonard had prepared for his signature in the amount of $216,000 which should have been paid to Teledyne. In addition, Teledyne received no payments out of the

subsequent final Army payment of $81,448.90. Although it is unclear from the record what portion of this payment should have gone to Teledyne, it is our understanding that because of prior progress payments the amount was in fact less than the total of Teledyne invoices.[12] Accordingly, the defendants will be jointly and severally liable for damages in the sum of $297,448.90, with prejudgment interest calculated from the dates on which Eon received funds from the government.

### Conclusion

In summary, it is ordered that judgment be entered on behalf of the plaintiff against each of the defendants in the sum of $297,448.90 with interest as above indicated. Judgment is to be submitted within five days of the filing of this opinion.

The foregoing constitutes the court's findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

So ordered.

---

12. If our understanding is incorrect, we will entertain a motion to amend this part of the judgment within five days of the filing of

the opinion. The motion papers should include affidavits and exhibits on this point.