**CUMBERLAND OIL CORPORATION and Sugargrove, Ltd., Plaintiffs-Appellants,**

v.

**James THROPP, Gregory Thropp, Arrowhead Gas Producers, Inc., and Southern Tier, Ltd., Defendants-Appellees.**

**No. 709, Docket 85–7855.**

United States Court of Appeals, Second Circuit.

Argued Jan. 22, 1986.

Decided May 30, 1986.

Robert L. Beck, Rochester, N.Y. (Sutton, DeLeeuw, Clark & Darcy, Rochester, N.Y., of counsel), for plaintiffs-appellants.

David Rothenberg, Rochester, N.Y. (Geiger & Rothenberg, Rochester, N.Y., of counsel), for defendants-appellees.

Before MANSFIELD, MESKILL and PIERCE, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Western District of New York, Telesca, J., granting summary judgment and dismissing an action for fraud against persons associated with a bankrupt corporation. The district court granted summary judgment to the defendants under *Mitchell Excavators, Inc. v. Mitchell*, 734 F.2d 129 (2d Cir.1984). Because of the district court's reliance on *Mitchell*, we assume that the court viewed the instant cause of action as property of the bankruptcy estate under 11 U.S.C. § 541 (1982).

We hold that the cause of action for fraudulent inducement of contract was not property of the bankruptcy estate under *Mitchell*. We affirm the grant of summary judgment, however, because the plaintiffs-appellants failed to rebut the affidavits and depositions filed in support of the defendants-appellees' motion for summary judgment. The motion claimed the absence of injury flowing proximately from the alleged misrepresentations, an essential element of the fraud claim.

This disposition requires us to set out the facts in some detail. In doing so we rely, of course, on the complaint and on the affidavits and exhibits in support of the cross-motions for summary judgment.

## BACKGROUND

### 1. *The Negotiations and the Contract*

Cumberland Oil Corporation (Cumberland) and Sugargrove, Ltd., a limited partnership, are both organized under Georgia law. In 1980 Cumberland was investigating the possibility of diversifying its operations by investing in gas wells. Gregory Thropp was the president and sole shareholder of a now-defunct corporation named Benchmark Oil (Benchmark). In early 1980 Benchmark was in the business of acquiring oil and gas properties, drilling oil and gas wells and operating gas wells. James Thropp, Gregory's father, was not an officer of Benchmark but apparently was "a big guy in the oil and gas business in the area" around Olean, New York. Thrasher Dep. at 30. James and Gregory Thropp are New York residents.

In February 1980 Cumberland's president, J. Robert Murray, Cumberland's lawyer, H. Grady Thrasher III, and several others met with Gregory Thropp in Benchmark's office in Olean, New York. The purpose of the meeting was for the Cumberland representatives to investigate Cumberland's entry into the gas business. Cumberland's consultant on the venture, Richard Beutel, had recommended Benchmark as a potential contractor to drill and operate the wells for Cumberland.

Attorney Thrasher accompanied Murray to the meeting with Gregory Thropp. Although Cumberland was "basically preconditioned to accepting" Benchmark as the driller of its wells, Thrasher Dep. at 14, Thrasher asked Thropp for recent financial

information on Benchmark. The purpose of doing so was "to make sure that they didn't have creditors filing liens against them or that ... they were[n't] on the edge of financial collapse because once you turn that money over to them, then it's up to them to deliver and perform under the contract." *Id.* at 15. According to Thrasher, Thropp replied that he would not disclose financial information and then "in an almost indignant way, he said basically rest assured that we are very capable of doing the job, and we are in ... excellent financial shape, and we have been in the Olean area for years and, you know, have always lived up to our financial commitments." *Id.*[1]

On March 22, 1980 Benchmark and Cumberland executed a "Drilling and Development Agreement" in which Benchmark agreed to drill up to three wells. Cumberland agreed to pay a "turnkey price" for each well and Benchmark was to drill the well "to such depth as is, in the opinion of the qualified geologist or petroleum engineer employed by Cumberland, adequate to properly test the ... formation," Complaint, Ex. A, ¶ 3(a). The contract provided for each well to be tested before Benchmark was paid for the well and before it undertook to drill the succeeding well. *Id.* at ¶ 3(a)–(c).[2]

Cumberland had a side agreement with its engineering consultant's firm that specifically referred to the three wells and provided that when Cumberland requested, the firm would furnish "supervision of field operations concerned with the drilling and operation of the wells, engineering supervision during well completion, engineering studies" and other services, J.App. at 36.

Benchmark drilled the three wells and Cumberland paid for them. When problems developed in drilling one of the wells, Benchmark redrilled it. Yet, despite these efforts, only the last of the three wells ultimately produced gas in commercially salable quantities; this well produced ninety percent of the gas produced by the three wells.

The parties do not dispute that water intruding into two of the wells reduced the amount of gas that could come up through the wells. Cumberland claims that the intrusion of water was caused by "fracturing" the wells at the wrong depth and by leaving acid in the well holes too long.[3]

Between March and October 1980 Benchmark drilled nineteen wells in addition to the three wells drilled for Cumberland.

### 2. *The Bankruptcy and the* Monroe Resource *Case*

Gregory Thropp's representation that Benchmark was in good financial shape was either incorrect in February 1980 or was soon to become so. Circumstances changed substantially before Benchmark and Cumberland signed their contract in

---

1. Gregory Thropp also presented and discussed some production records for wells that Benchmark had recently drilled. These records showed very significant production. Murray Dep. at 94–95. He made no assurances that the wells Benchmark might drill for Cumberland would produce at the same levels. *Id.* at 97.

2. The contract also provided that Benchmark would hook up the wells to a pipeline. The parties made a separate agreement that Benchmark would operate the wells for Cumberland in return for a fee.

3. The fracturing of a gas well occurs during the "completion process" by which a well whose drilling has been completed is prepared for production. A sister court has described the "fracturing" process as "involv[ing] pumping water or another liquid mixed with sand into the well at [high pressure]. The pressure forces open fractures in the reservoir rocks thereby permitting a greater amount of oil or gas to reach the well." *Western Company of North America v. United States*, 699 F.2d 264, 266 n. 3 (5th Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). Acid is used in the completion process. "Acidizing" has been described as a process in which "a solution of ... acid is pumped into a well which has been completed.... The acid dissolves part of the rock, thereby increasing its permeability and stimulating a greater flow of oil or gas into the well." *Western Company*, 699 F.2d at 266 n. 2. When the acid is left in the well too long, it damages the pipe that is in the hole. The acid was left in the three Cumberland wells for thirteen days, nine days and fourteen days, respectively. Coincidentally, the well in which acid was left the longest was the largest producer.

March 1980. In late February Benchmark assigned some of its royalty rights to the Thropps. The record is silent as to what Benchmark received in return. On March 21, 1980 Benchmark sold its land department for $100,000 to a corporation owned by the Thropps. On March 24, 1980 Benchmark assigned 2,542 acres of land to Gregory Thropp for $7,266.50, Benchmark's purchase price. These transactions stripped Benchmark of valuable assets.

During the spring and summer of 1980 the Thropps carried out a series of transactions involving the establishment of new corporations and the transfer of assets in and out of those corporations. It is unclear from the record to what extent these transactions involved the misappropriation or fraudulent conveyance of Benchmark assets. It does not appear that Gregory Thropp ever admitted liability for misappropriation or fraudulent conveyance of Benchmark assets. These transactions are relevant here only to the extent that they support Cumberland's charge that the Thropps had a "plan" and a conspiracy to defraud Cumberland by inducing it to enter into a contract with a business that had effectively ceased to exist.

On October 20, 1980, after the three Cumberland wells were drilled, one of Benchmark's creditors served it with a petition of involuntary bankruptcy. Cumberland learned of this development and removed Benchmark as the operator of the three wells.

A Benchmark creditor, Monroe Resources, Inc., sued the Thropps in New York state court in pleadings dated October 9, 1981. The *Monroe Resources* complaint pled causes of action for misrepresentation, breach of contract and negligence. That action was settled and, to avoid the consequences of a preferential transfer, the settlement was conditioned upon Benchmark's paying in full all credi-

tors whose claims had been filed with the bankruptcy court. Cumberland was not among these creditors.

Although Cumberland had notice of Benchmark's bankruptcy, it did not file a claim in bankruptcy court for breach of contract or negligence against Benchmark, presumably because the limitations period for filing claims under Bankruptcy Rule 3002 had expired. *See* Bankr.R. 3002(c); Br. of Plaintiffs-Appellants at 4; J.App. at 294, 302. *See also In re Sullivan*, 36 B.R. 771, 772 (Bkrtcy.E.D.N.Y.1984).[4]

The settlement in the *Monroe Resources* case was specifically approved by the bankruptcy court on November 17, 1982. Benchmark's bankruptcy trustee had also filed an action in the bankruptcy court against the Thropps and their corporations for fraudulent transfers. She received authority to compromise that case and the action was later dismissed.

### 3. *Proceedings Below*

Cumberland consulted with Monroe Resources' attorney as early as January 1982 about pursuing a common law remedy for fraud against the Thropps. Cumberland and the attorney agreed that he would "try to help" Cumberland as soon as the settlement check in the *Monroe Resources* case cleared. J.App. at 312.

On May 5, 1983, two days after Benchmark's creditors were paid dollar for dollar on their timely claims, Cumberland filed a complaint against James Thropp, Gregory Thropp and their corporations alleging causes of action for fraud, breach of contract and negligence. The Thropps moved to dismiss the complaint. The district court held that Cumberland stated a cause of action for fraud against Gregory Thropp but dismissed the contract and negligence claims as to all defendants. It dismissed the fraud claim against James Thropp and

---

**4.** Cumberland could have filed a claim in the bankruptcy court whether that claim was "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" or if it were a "right to an equitable

remedy for breach of performance if such breach [gave] rise to a right to payment, whether or not such right to an equitable remedy [was] reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. § 101(4).

the Thropps' corporations without prejudice and with leave to replead. We affirmed the dismissal of the contract and negligence claims. *Cumberland Oil Corp. v. Thropp*, 732 F.2d 141 (2d Cir.1984) (unpublished order).

Cumberland's Second Amended Complaint stated claims for fraud against James Thropp and Gregory Thropp as principals in a "conspiracy to defraud the plaintiffs." J.App. at 69 ¶ 16. The complaint stated that Benchmark was obligated "to provide the proper men, equipment and materials to perform the [Cumberland] contract in a good and workmanlike manner." *Id.* at 42 ¶ 24. The complaint went on to allege that due to the "stripping of Benchmark assets in March of 1980, Benchmark [became] a shell corporation without the mechanical or technical capacity or financial ability to fulfill the terms of the contract." *Id.* at 72 ¶ 25.

After the denial of a motion to dismiss the amended complaint and a year and a half of discovery proceedings, Cumberland and Sugargrove submitted a motion, supported by affidavits and exhibits, for partial summary judgment dismissing the defendants' counterclaim and affirmative defenses. The Thropps filed a similarly supported cross-motion for summary judgment. Their motion papers asserted that Gregory Thropp's statements about Benchmark's financial health were statements of opinion, not misrepresentations of fact. The Thropps' motion papers also asserted that Benchmark (1) did drill the three wells, (2) drilled nineteen other wells between March and October 1980, (3) used essentially the same crew to drill Cumberland's wells that it used on the other wells, and (4) redrilled one of the Cumberland wells at no charge to Cumberland. These four affirmations, which went to the question of whether Cumberland had suffered a fraud "injury," were not disputed.

Cumberland instead responded by submitting a detailed "Chronology of Events" arguing that a misrepresentation of fact indeed occurred. The "Chronology" attempted to demonstrate that Gregory Thropp misrepresented Benchmark's financial health to Cumberland and that the Thropps embarked upon a scheme to loot Benchmark before Benchmark and Cumberland entered into their contract.

Responding to the Thropps' arguments on the issue of injury, Cumberland made only this statement:

10. That, finally, plaintiffs note the frequent references to technical matters concerning the so-called adequacy of the drilling of the wells at issue, and ask the Court to realize that plaintiffs have attempted to distinguish in the preparation of this cause between liability and damages; *that they have, to date, offered no proof concerning the damage which, by virtual abandonment, was caused to these wells.* That plaintiff submits that expert testimony concerning the foregoing should be left until the time of trial and after a determination of liability is made by the Court.

J.App. at 257 (additional emphasis added). Cumberland thus declined to respond to the argument that Cumberland got all that it contracted for and did not suffer any injury, regardless of Gregory Thropp's representations regarding Benchmark's financial health.

Prior to oral argument on the summary judgment motions, the district court called the parties' attention to *Mitchell Excavators, Inc. v. Mitchell*, 734 F.2d 129 (2d Cir.1984). In *Mitchell* we held that a shareholder's derivative action was property of the bankruptcy estate and directly prosecutable by the trustee in bankruptcy. *Id.* at 130. The district court relied on *Mitchell* and dismissed the instant action without prejudice to the plaintiffs' attempting to assert their claim in the bankruptcy court. The court reasoned that "Benchmark's creditors in the bankruptcy proceeding were in essentially the same position as was the shareholder in *Mitchell*—both could enhance the value of their assets ... by asserting that the value had been diminished by the former officers' misappropriation of assets of the bankrupt corporation." J.App. at 274–75.

On this appeal Cumberland argues that *Mitchell* does not apply to this case because this is an action for fraud. Cumberland claims that it is entitled to a trial on the fraud claim against James Thropp and Gregory Thropp.

## DISCUSSION

### 1. *The Bankruptcy Estate*

■ Under section 541 of the Bankruptcy Code the bankruptcy estate includes, with exceptions not relevant here, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 541 has been construed to prevent individual shareholders and creditors from suing to enforce a right of the corporation when that corporation is in bankruptcy. *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275 (5th Cir. 1983) (holding that action by creditor under the Texas Fraudulent Transfers Act belongs to the bankruptcy estate); *Mitchell*, 734 F.2d at 131 (shareholder's derivative suit is property of the estate); *see also Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939) (construing § 70(a) of the Bankruptcy Act of 1898, 11 U.S.C. § 110(a) (repealed 1978), and noting that trustee can bring both direct and derivative actions for breach of fiduciary duty).

Making the pursuit of certain causes of action the sole responsibility of the trustee in bankruptcy furthers the fundamental bankruptcy policy of equitable distribution among creditors. *See MortgageAmerica*, 714 F.2d at 1275. It allows the trustee to exercise the "strong arm" power and recover corporate assets for the benefit of all creditors of the corporation. *See id.* This policy would only be relevant to this case, however, if Cumberland had asserted rights belonging to the corporation by suing under the New York fraudulent conveyance statute. *See* 11 U.S.C. § 544(b); N.Y.Debt. & Cred.Law § 270–81 (McKinney 1945); *see also In re O.P.M. Leasing Services*, 28 B.R. 740, 759 (Bkrtcy.S.D.N.Y. 1983) (right to sue directors and officers of bankrupt corporations for breach of their fiduciary duties and for violating fraudulent conveyances law passes to bankruptcy trustee).

Benchmark's right to recover misappropriated corporate assets was vindicated by the bankruptcy trustee's suit against the Thropps. In the case before us, however, Cumberland has not claimed a right on its own or Benchmark's behalf to recover misappropriated assets. Instead, it alleges that it suffered damages because of Gregory Thropp's intentional fraud. The right to recover for this alleged tort belongs to Cumberland, not to Benchmark. The cause of action is Cumberland's property, not part of the bankruptcy estate. Thus, this case is not controlled by *Mitchell. See Teledyne Industries v. Eon Corp.*, 401 F.Supp. 729, 735–36 (S.D.N.Y.1975) (actions for fraud and conversion brought against individual officers of bankrupt corporation not barred by confirmation of arrangement including plaintiff's claim against corporation itself in the bankruptcy proceeding), *aff'd sub nom. Teledyne Industries v. Podell*, 546 F.2d 495 (2d Cir.1976) (per curiam, affirming on opinion of district court); *cf.* 4 Collier on Bankruptcy ¶ 541.10[8] at 541–67 to 541–68 (L.King ed. 1985) (where state law confers on creditors a *personal* right to levy an assessment on unpaid shares of stock held by corporate officers or directors, rather than conferring such a right on the corporation, trustee does not have standing to collect the assessment).

The Thropps also argue that Cumberland's claims are merely artful repleadings of claims that would either be property of the bankruptcy estate or discharged in bankruptcy. It is true that the same facts that Cumberland pled in its complaint could have been pled in support of claims of breach of contract or violation of the fraudulent conveyance laws, all of which would either be property of the estate or would be discharged. *See* 11 U.S.C. § 727(b) (discharge of all unexcepted debts arising before date of discharge); 11 U.S.C. § 101(4), (11) (definitions of "claim" and "debt"); *MortgageAmerica*, 714 F.2d at 1275–76 (creditors' action under state fraudulent

conveyances act becomes property of estate); *Mitchell*, 734 F.2d at 131 (stockholder's derivative right of action passes to estate). Indeed, Cumberland appears to concede that it grounded its complaint on a fraud theory only because it missed the statute of limitations for filing a claim as a creditor.

It is also true that a fraud complaint may be dismissed where it merely restates contract claims. *Freyne v. Xerox Corp.*, 98 App.Div.2d 965, 470 N.Y.S.2d 187, 188 (4th Dep't 1983). Nevertheless, we conclude that the complaint was not merely an artful repleading of claims that were discharged in bankruptcy because Cumberland has alleged with particularity that misrepresentations of facts were made by Gregory Thropp in furtherance of a conspiracy to defraud Cumberland.

Thus, the district court erred when it granted summary judgment to the Thropps on the basis that Cumberland's action for fraud was property of the estate under *Mitchell* or was discharged in bankruptcy.

2. *Summary Judgment*

█ Although we have concluded that the district court incorrectly applied *Mitchell* in granting summary judgment to the Thropps, we nevertheless determine that it is appropriate to affirm the grant of summary judgment. *Reynolds v. United States*, 643 F.2d 707, 710 (10th Cir.), *cert. denied*, 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 865 (1981); *Church of Scientology of California v. Cazares*, 638 F.2d 1272, 1281 (5th Cir.1981). "The appellate court does not have to affirm a decision on a Rule 56 motion for the same reasons that persuaded the court below to grant the motion." 10 C. Wright, A. Miller, M. Kane, Federal Practice and Procedure, § 2716 at 658 (1983); *see also Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937) ("In the review of judicial proceedings the rule is settled that if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason."); *Walton v. Morgan Stanley &*

*Co.*, 623 F.2d 796, 797 & n. 1 (2d Cir.1980) (citing *Helvering v. Gowran*, 302 U.S. at 245–46, 58 S.Ct. at 158).

We would hesitate to affirm the grant of summary judgment if the proper ground for granting it had not been raised and argued below. *See British Airways Board v. Port Authority*, 558 F.2d 75, 82 (2d Cir.1977). However, the ground we hold to be proper for granting summary judgment was raised and argued below. Therefore, we may rely on it in affirming the result reached below.

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial." Fed.R.Civ.P. 56 advisory committee note (1963 Amendment). Thus, Rule 56(e) requires that when one party moves for summary judgment and supports the motion with affidavits and exhibits "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added).

This requirement is especially critical where, as here, a defendant has moved for summary judgment and has presented evidentiary materials that negate one or more elements of the plaintiff's *prima facie* case. Where the defendant demonstrates that there is no evidence to support an essential element of the plaintiff's claim, then "trial would be a bootless exercise, fated for an inevitable result but at continued expense for the parties, the preemption of a trial date that might have been used for other litigants waiting impatiently in the judicial queue, and a burden on the court and the taxpayers." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Under New York law a person who induces another to enter into a contract by misrepresenting a material fact or making a promise that he or she has no intention of keeping may be held liable in damages for fraud. *DiRose v. PK Management Corp.*,

691 F.2d 628, 630 (2d Cir.1982), *cert. denied,* 461 U.S. 915, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983); *Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 262–63, 151 N.E.2d 833, 835–36 (1958). The essential elements of the cause of action are

> (1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury.[5]

*Brown v. Lockwood,* 432 App.Div.2d 186, 432 N.Y.S.2d 186, 193 (2d Dep't 1980); *see also Computerized Radiological Services v. Syntex Corp.,* 786 F.2d 72, 76 (2d Cir. 1986). The misrepresentation of a material fact must have proximately caused the injury. *Cable v. Hechler,* 532 F.Supp. 239, 245 (E.D.N.Y.1981), *aff'd mem.,* 685 F.2d 423 (2d Cir.1982); *see Rumph v. Gotham Ford, Inc.,* 44 App.Div.2d 792, 355 N.Y. S.2d 114, 117 (1st Dep't), *appeal dismissed,* 34 N.Y.2d 952, 359 N.Y.S.2d 566, 316 N.E.2d 879 (1974); *Central State Bank v. American Appraisal Co.,* 33 App.Div.2d 1009, 307 N.Y.S.2d 708, 709 (1st Dep't 1970), *aff'd,* 28 N.Y.2d 578, 319 N.Y.S.2d 615, 268 N.E.2d 327 (1971); *Latzko v. Spector,* 28 App.Div.2d 1111, 284 N.Y.S.2d 545, 546 (1st Dep't 1967), *aff'd,* 22 N.Y.2d 710, 291 N.Y.S.2d 818, 238 N.E.2d 924 (1968). An injury is proximately caused if it is the natural and probable consequence of the defrauder's misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud. *Cable,* 532 F.Supp. at 245; *see also Montague Associates v. Gallo*

*Wine Distributors,* 12 Misc.2d 182, 172 N.Y.S.2d 203, 205 (Sup.Ct.1958). In this case the Thropps have demonstrated that there is no genuine issue of fact regarding whether Cumberland suffered injury as a proximate result of Gregory Thropp's alleged misrepresentation. Thus, it would be a "bootless exercise" to remand this case for trial.

Cumberland's theory was that, as of February 16, 1980, Gregory Thropp knew that Benchmark would be so weakened by looting that it would virtually have to abandon the drilling of Cumberland's wells. The Thropps' moving papers attacked this theory of Cumberland's injury stating, "plaintiffs allege that Gregory Thropp defrauded them when he stated that Benchmark was ready, willing and able to carry out its contractual obligations with Cumberland. However, the record is very clear that Benchmark did just that." J.App. at 170 ¶ 22.

The motion papers contained documentary and deposition evidence to establish that (1) Benchmark drilled three wells for Cumberland, including the redrilling of one well, (2) Benchmark drilled nineteen other wells between March and October 1980, and (3) Benchmark kept its usual field crew on the job when it drilled Cumberland's wells.

Cumberland's response to this detailed showing was to fall back on the allegations in its complaint. Its counsel acknowledged that it had "offered no proof concerning the damage which, by virtual *abandonment,* was caused to these wells." J.App. at 257 ¶ 10.[6]

Cumberland, belatedly recognizing this void in its response to the motion for sum-

---

5. For the purposes of this decision we are assuming without deciding that Gregory Thropp's statements about Benchmark's financial condition were statements of fact.

6. The "Chronology" that Cumberland's counsel submitted in opposition to the summary judgment motion attempted to develop this "abandonment" theory by stating that Gregory Thropp divorced himself from the day-to-day operations of Benchmark and stopped soliciting business

for Benchmark. Yet Cumberland offered no elaboration of what facts it relied on to prove that the *wells* were abandoned by Benchmark. It is irrelevant to this case what Gregory Thropp did or failed to do during the spring and summer of 1980. The drilling contract was not a personal services contract and did not require Gregory Thropp to make daily visits to the drilling sites.

mary judgment, states in its reply brief on this appeal that "[n]o expert testimony has *yet* been taken on the question of *actual damages*, damages proximately caused by Benchmark's financial inability to properly drill the wells at issue and to take the expensive steps technically to avoid the irreversible damage that was caused." Reply Br. of Plaintiffs-Appellants at 5–6. Cumberland also makes vague promises to prove at trial that contract payments were not properly applied and that "work on these wells was virtually abandoned by Gregory Thropp." *Id.* at 6.

There is no need, however, to inflict the expense and burden of further proceedings on the Thropps. Discovery in this case lasted for over a year and a half. Cumberland does not argue that the Thropps prevented it from supporting its allegation that Benchmark injured it by abandoning the Cumberland wells. Furthermore, Cumberland makes no effort to justify its failure to inform the district court of the reasons why it failed to provide affidavits to support this essential element of its case. *See* Fed.R.Civ.P. 56(f).

Most importantly, the proof that Cumberland offers to provide after further discovery would not establish a genuine issue of fact as to whether Cumberland suffered a fraud injury. As a matter of law, none of the "injuries" that Cumberland suggests it could prove after further discovery would establish a fraud injury.

Further proof of Benchmark's financial troubles, for instance, would not prove a fraud injury to Cumberland. The drilling contract did not specify that Benchmark was to undertake any particular "expensive steps" as alleged by Cumberland. Rather, it provided that Benchmark was to drill wells to meet the standards of Cumberland's geologist, to complete the wells if the geologist approved and then to turn the completed wells over to Cumberland. The contract further provided that Benchmark would not be paid until Cumberland's consultant was satisfied that Benchmark had performed by drilling each well to his specifications. Cumberland paid Benchmark.

Moreover, Benchmark kept full crews on the Cumberland wells and when the need arose Benchmark was able to take the "expensive step" of redrilling a well. In short, Cumberland has failed to produce *any* evidence of a link between Benchmark's financial condition and alleged deficiencies in Benchmark's performance of the contract. Additional proof of Benchmark's financial straits will not forge that link.

In addition, what Benchmark did with the payments for the wells is irrelevant. Under the drilling contract Benchmark did not become entitled to receive payment for a well until Cumberland's consultant approved that well. Even if the Thropps did in fact misappropriate the payments, that fact is irrelevant as long as the next well was drilled in a workmanlike fashion and met geologist's specifications. *See* 4 W. Summers, The Law of Oil and Gas, § 684 at 167 (1962). What Cumberland bargained for in its contract with Benchmark was the drilling of gas wells, not for an equity interest in or a chattel security interest against Benchmark. Cumberland, therefore, could not prove a fraud "injury" by providing further proof of corporate looting.

## CONCLUSION

The district court erred when it concluded that Cumberland's fraud action was property included in the bankruptcy estate. Cumberland failed to establish, however, that there is a genuine issue of a material fact on the question of injury resulting from Gregory Thropp's alleged misrepresentations. The Thropps are thus entitled to summary judgment as a matter of law and, accordingly, the judgment of the district court is affirmed.